# E. R. STARKWEATHER v. FRANK D. BLAIR AND OTHERS.[1]

August 5, 1955.

No. 36,538.

[1]Reported in 71 N. W. (2d) 869.

*Miles Lord,* Attorney General, *Robert Garrity* and *Melvin J. Peterson,* Assistant Attorneys General, and *Raymond A. Haik,* Special Assistant Attorney General, for appellants.

*Mandt Torrison, Andrew Miner, Carl O. Wegner, Bundlie, Kelley & Maun, Miner & Miner,* and *Wegner & Santee,* for respondent.

KNUTSON, JUSTICE.

Plaintiff, E. R. Starkweather, had been an employee of the state in the game and fish division of the department of conservation for many years. He was appointed deputy director of game and fish in June 1939. On December 28, 1940, his position was classified by the state civil service department as game and fish executive, this position being within the classified service under the state civil service law. In 1946 the position of assistant director of the division of game and fish was created. On December 3, 1946, plaintiff was appointed to the newly created position. On March 24, 1949, he was permanently certified to this position. He held it until he was laid off, as hereinafter stated, on June 30, 1953. He is the only person who has ever held this position since its creation.

The division of game and fish is a division of the conservation department of the state.[2] It is financed from a fund known as the

---

[2]M. S. A. c. 84.

game and fish fund, into which go all license fee receipts and other receipts accruing to the state by virtue of the operation of the division. Appropriations are made from the fund by the legislature for the biennium. M. S. A. 97.49, subd. 1, after providing for the deposit of such funds with the state treasurer, contains the following provisions:

"* * * all such moneys [those deposited in the game and fish fund] are hereby annually appropriated for the maintenance and conduct of the activities of the division, subject, however, to any special provisions which may be contained from time to time in appropriation acts."

Preliminary to such appropriation, the division, the same as other departments of government, prepares a budget in which it estimates what it will need to run the division for the next biennium. In the proposed budget it lists the personnel of the department. The proposed budget then goes to the bureau of administration and then to the governor before it is submitted as part of the governor's proposed budget recommendation to the legislature.

In the budget submitted to the legislature in 1953 the position and salary of plaintiff was one of the items listed. The budget went to the legislature, upon recommendation of the governor, containing plaintiff's salary as one of the items making up the total. The legislature enacted an appropriation bill (L. 1953, c. 741) which included, among other things, the following provisions relating to the department of conservation:

"Sec. 38. DEPARTMENT OF CONSERVATION:
"There is hereby appropriated to the Commissioner of Conservation the following amounts for the following purposes, said amounts to be under the control of and to be expended by direction of the Commissioner of Conservation.
\* \* \* \* \*
"F. Division of Game and Fish:
"1. Administration:

|  | [1954] | [1955] |
| --- | --- | --- |
| "a. Salaries ........................... | 103,835 | 104,469 |

"Of the amounts appropriated for salaries in Item 1a above, no part shall be used to pay the salary of an Assistant Director of the Division of Game and Fish.

\* \* \* \* \*

"9. \* \* \*

"\* \* \* There is hereby appropriated from the game and fish fund the sum of $500,000 for the year ending June 30, 1954, and $500,000 for the year ending June 30, 1955, for the purpose of supplementing any requirements of the Division of Game and Fish, for salaries, supplies and expense, to be administered by the Legislative Advisory Committee, as provided by law."

The amount so appropriated for salaries was the amount requested in the budget less the salary paid to the assistant director of game and fish.

Thereafter, during the month of May, Frank D. Blair, director of the division of game and fish, notified plaintiff by letter in the following language that the position which he held would be discontinued:

"Mr. E. R. Starkweather,
 Assistant Director,
 Division of Game and Fish.
"Dear Mr. Starkweather:

"Re: Discontinuance of the position of
 Assistant Director of Game and Fish
"This is to notify you that as of the end of the date of June 30, 1953, the position you now hold as Assistant Director of the Division of Game and Fish will be discontinued because of the recent action of the State Legislature in prohibiting the use of appropriated funds to pay the salary of an Assistant Director, in accordance with Laws 1953, Chapter 741, Section 38, Subdivision F, Item 1.
"In the meantime you may take your accrued vacation leave, or work up to the end of June 30, 1953 and receive full reimbursement for such accrued vacation leave.
"Please advise of your preference.

"Very truly yours,
"Frank D. Blair,
 Director, Division of
 Game and Fish."

Plaintiff's name was thereupon placed on the layoff register. He requested demotion to another position, and on November 9, 1953, accepted a position as game warden supervisor II in the division of game and fish, which position he still held at the time of the trial. Plaintiff was given no hearing prior to his layoff, nor did he request any. He took no appeal to the civil service board.

This action was brought for a declaratory judgment seeking a determination of plaintiff's civil service status and his right to pay as an assistant director, it being his contention that the rider attached to the appropriation bill by the legislature was void. His pay as assistant director was $616 per month. As warden supervisor he received $420 per month. The trial court held the rider invalid for the following reasons:

(1) That it offends the state and federal constitutions prohibiting bills of attainder and *ex post facto* laws.

(2) That it offends the constitutional provisions prohibiting laws which impair the obligation of contract.

(3) That it is unconstitutional and inoperative in that it seeks to force the removal of a state officer in the executive branch of the government for reasons other than malfeasance or nonfeasance in the performance of his duties.

(4) That it is arbitrary, unreasonable, and despotic and deprives plaintiff of the equal protection of the law and of his liberty and property.

(5) That it is not an attempt to abolish an office but rather is an attempt to abolish the officer while leaving the office standing.

This appeal is from the judgment entered pursuant to the court's findings adjudging that the rider attached to the appropriation bill was an invalid exercise of legislative authority for the reasons stated above and adjudging that plaintiff is entitled to reinstatement as assistant director "so long as there are funds appropriated which may legally be used to pay the salaries of administrative officials of the Division of Game and Fish."

Defendants' brief is hardly a model in presenting this case on appeal. In the original brief, certain errors are assigned, and in the

reply brief, certain other errors. There should be some familiarity with our rules with respect to the manner in which errors should be assigned. However, the principal question involved in this case is the constitutionality of the act, and, in view of the public interest involved, we have concluded to consider all phases of the case. The trial court has placed decision on a number of grounds, some of which are wholly unrelated, and, if any of these grounds are tenable, the judgment should be affirmed. We shall accordingly consider separately each ground upon which the trial court placed its decision.

Is the rider a bill of attainder? Historically, bills of attainder had their origin in England about the 13th century.[3] With respect to their use, Story, in his commentaries on the constitution, had this to say:

"* * * Bills of this sort have been most usually passed in England in times of rebellion, or of gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free as the enslaved) to forget their duties, and to trample upon the rights and liberties of others."[4]

Technically, bills of attainder were special acts of the legislature inflicting capital punishment upon persons supposedly guilty of high crimes, such as treason or a felony, without a conviction in the ordinary course of a judicial proceeding. In addition to the punishment, it was usual to hold that there was a corruption of the blood which prevented the accused from passing property by inheritance. Offenses of less severity, where less than capital punishment was involved, were known as bills of pains and penalties. Bills of attainder were quite common among the colonies prior to the adoption of the constitution.[5]

It was with this background that the framers of our constitution included a provision denying to congress or to the states power to

---

[3]For an interesting discussion of the early use of bills of attainder in England, see article by the Right Honorable Lord Justice Somervell, 67 L. Q. Rev. 306.

[4]See, 2 Story, Constitution (5 ed.) § 1344.

[5]See, Annotation, 90 L. ed. 1268; Pound, *Justice According to Law*, 14 Col. L. Rev. 1; 8.

enact bills of attainder. See, Minn. Const. art. 1, § 11. The prohibition of such acts first came into prominence after the Civil War when many of the states and congress alike sought to deny to those who had participated in the war against the Union rights and privileges which others would have. In the leading case of Cummings v. State of Missouri, 71 U. S. (4 Wall.) 277, 18 L. ed. 356, the United States Supreme Court struck down a provision of the Missouri reconstruction constitution which required persons to take an oath of loyalty as a prerequisite to practicing a profession. Cummings, a Catholic priest, was convicted for teaching and preaching as a priest and minister without taking the oath. The oath required an applicant to affirm that he had never given aid or comfort to persons engaged in hostility to the United States and had never (71 U. S. [4 Wall.] 279) "been a member of, or connected with, any order, society, or organization, inimical to the government of the United States." In its opinion, the court defined a bill of attainder as follows (71 U. S. [4 Wall.] 323, 18 L. ed. 363) :

"A bill of attainder is a legislative act which inflicts punishment without a judicial trial."

The court held that the historical bill of pains and penalties was within the constitutional proscription as much as the technical bill of attainder.

On the same day that the Cummings case was decided, the court struck down an act of congress which required attorneys practicing before the United States Supreme Court to take an oath quite similar to the one involved in the Cummings case. Ex parte Garland, 71 U. S. (4 Wall.) 333, 18 L. ed. 366. These two cases have become landmark cases in dealing with the question of bills of attainder.

Plaintiff relies for the most part upon the case of United States v. Lovett, 328 U. S. 303, 66 S. Ct. 1073, 90 L. ed. 1252. In that case, congress, after extensive investigations into subversive activities of government employees, the nature of which are fully set forth in the opinion of the supreme court and need not be repeated here, included as a part of a deficiency appropriation bill a provision that no salary or compensation should be paid to three named individuals out of

any money then or thereafter appropriated except as jurors or members of the armed forces unless they were, prior to a named date, again appointed to jobs by the President with the advice and consent of the senate.[6] The act was reluctantly signed by the President after he had stated that he felt that the law was unconstitutional. The named individuals continued to work at their jobs after passage of the act and later brought actions in the court of claims to recover compensation for the services they had so rendered. The court of claims held that they were entitled to recover, the judges differing as to the reason why.[7] Upon certiorari, the decision of the court of claims was affirmed by the United States Supreme Court, the majority of the court being of the opinion that the act was a bill of attainder within the meaning of our federal constitution.

There are many distinguishing features between the Lovett case and the one now before us. In the first place, the act involved in the Lovett case goes much further than to prevent payment of the salary of named individuals in any particular job. It permanently barred them from any federal employment. This feature of the act was clearly recognized by the Honorable Judge Jones in his concurring opinion in Lovett v. United States, 104 Ct. Cl. 557, 588, 66 F. Supp. 142, 149, where he said:

[6] Urgent Deficiency Appropriation Act of 1943, 57 Stat. 431, § 304, provides as follows:

"No part of any appropriation, allocation, or fund (1) which is made available under or pursuant to this Act, or (2) which is now, or which is hereafter made, available under or pursuant to any other Act, to any department, agency, or instrumentality of the United States, shall be used, after November 15, 1943, to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Junior, and Robert Morss Lovett, unless prior to such date such person has been appointed by the President, by and with the advice and consent of the Senate: *Provided*, That this section shall not operate to deprive any such person of payment for leaves of absence or salary, or of any refund or reimbursement, which have accrued prior to November 15, 1943: *Provided further*, That this section shall not operate to deprive any such person of payment for services performed as a member of a jury or as a member of the armed forces of the United States nor any benefit, pension, or emolument resulting therefrom."

[7] Lovett v. United States, 104 Ct. Cl. 557, 66 F. Supp. 142.

"If Section 304 were a mere denial of appropriation, however unjust it might be, it could not be successfully questioned. But it does not stop with a mere denial of appropriation. It goes far beyond this. It forbids on a permanent basis employment in the future. It thus becomes a permanent legislative ban."

This was recognized in the majority opinion of the United States Supreme Court where Mr. Justice Black, speaking for the court, said (328 U. S. 313, 66 S. Ct. 1078, 90 L. ed. 1258):

"We hold that the purpose of § 304 was not merely to cut off respondents' compensation through regular disbursing channels but permanently to bar them from government service, and that the issue of whether it is constitutional is justiciable. The section's language as well as the circumstances of its passage which we have just described show that no mere question of compensation procedure or of appropriations was involved, but that it was designed to force the employing agencies to discharge respondents and to bar their being hired by any other governmental agency. * * * Any other interpretation of the section would completely frustrate the purpose of all who sponsored § 304, which clearly was to 'purge' the then existing and all future lists of government employees of those whom Congress deemed guilty of 'subversive activities' and therefore 'unfit' to hold a federal job. What was challenged, therefore, is a statute which, because of what Congress thought to be their political beliefs, prohibited respondents from ever engaging in any government work, except as jurors or soldiers. * * * What is involved here is a congressional proscription of Lovett, Watson, and Dodd, prohibiting their ever holding a government job."

There is also another vital and probably insurmountable difference in the proof offered in the two cases. Apparently the Lovett case is the first in which the court has gone beyond the language of the act itself in seeking to determine the motive of congress in passing a bill. We have frequently held that the motives of the legislative body in enacting any particular legislation are not the proper

subject of judicial inquiry.[8] It must be kept in mind that there is an obvious difference between examining the journals of the legislature in seeking to determine legislative intent, *i.e.*, what the legislature intended by the language it used, and in seeking to determine the motives of the legislature in passing an act. As long as the legislature does not transcend the limitations placed upon it by the constitution, its motives in passing legislation are not the subject of proper judicial inquiry. That does not mean that the legislature may use a constitutional power to accomplish an unconstitutional result, but, before it can be held that the latter has been done, it must appear that the end result of the act accomplished some purpose proscribed by the constitution.

Even if we were to hold that it would be proper to inquire into the motives of the legislature, it is difficult to see how this could be done. In that respect there is a vital difference between acts of congress and acts of our state legislature. In determining what has preceded enactments of congress, reference may be had to the congressional record where debates of committees as well as action of congress itself are recorded. In our legislature there is no record of debates or other action taken, either in committee or otherwise, except such as are reported in the journals of the house and senate. Laws would rest on an insecure foundation if courts were to seek to determine motives of individual members of the legislature in passing laws by resort to extraneous evidence which was not part of the journal entry. Even if we were to hold that this could be done, the record in this case could not permit a judicial declaration of improper motive. The entire evidence relating to this subject is found in the testimony of Frank D. Blair, the director of the division, and of plaintiff herein, which is as follows:

---

[8]Arens v. Village of Rogers, 240 Minn. 386, 61 N. W. (2d) 508; see, also, Jewell v. Weed, 18 Minn. 247 (272); State v. City of Lake City, 25 Minn. 404; Bragg v. Chicago, M. & St. P. Ry. Co. 81 Minn. 130, 83 N. W. 511; Independent School Dist. No. 47 v. Meeker County, 143 Minn. 169, 173 N. W. 850; Higgins v. Lacroix, 119 Minn. 145, 137 N. W. 417, 41 L.R.A.(N.S.) 737.

Cross-examination of Mr. Blair:

"Q. Prior to the 1953 session of the legislature, Mr. Blair, you assigned Mr. Starkweather, did you not, to handle the legislative program for the Division of Game & Fish in the 1953 legislature?

"A. Well, I don't think that I assigned him to handle it, to use all the bureau supervisors, he was one of those that was put before the Legislature on game and fish legislation.

"Q. Now then, in the 1953 legislature, were you present at a committee hearing in the Senate Game & Fish Committee at which Mr. Starkweather made some statements that were challenged by some of the members of that committee?

"A. Yes. It was in the early part of the session, early part of January.

"Q. And following that committee hearing, you advised Mr. Starkweather to stay out of the senate Game & Fish Committee, that you would handle that committee yourself?

"A. That was after this meeting you just referred to?

"Q. That is right.

"A. Yes.

"Q. And from that point on, you handled game and fish matters before the Senate Game & Fish Committee, you and your other bureau heads, without the assistance of Mr. Starkweather?

"A. Yes.

\*　　\*　　\*　　\*　　\*

"Q. Mr. Blair, when did you first learn that the appropriations committee of the Senate and the House or either one of them, intended to eliminate Starkweather's salary?

"A. Well, I couldn't tell you the time and I don't remember the occasion when I first learned about it. I don't remember.

"Q. Did you learn of it in advance of the bill coming out?

"A. Oh, yes.

"Q. Did you have discussions at that time with members of the legislature in connection with it?

"A. No; I had no discussion with them.

"Q. And none of them consulted you with respect to any reason for eliminating Starkweather?

"A. No."

Starkweather's testimony on this question was as follows:

"Q. * * * In the performance of your duties, Mr. Starkweather, as assistant director of Game and Fish, have you had occasion to appear before various committees in the Legislature?

"A. Yes sir.

"Q. During what sessions of the Legislature have you made such appearances?

"A. Well, I believe at various times in various committees, almost every session since I have been in the department.

"Q. Did you have any particular function in the legislature of the 1951 session?

"A. Yes. In the 1951 session, the original instructions, I was to appear at the committees, of the Game and Fish Committee in the House and the Game and Fish Committee in the Senate.

"Q. Your instructions from whom?

"A. From Director Blair.

"Q. Were those instructions ever subsequently modified?

"A. Yes, they were modified; I believe it was in January some time, of that year, late in January.

"Q. 1951?

"A. Yes.

"Q. What was the modified instruction?

"A. The instructions were that I would take care of the Game and Fish in the Senate and I would appear at the Game and Fish Committees in the House.

"Q. Was this in 1951 or 1953?

"A. 1951 I am talking about now.

"Q. Who was the chairman of the Game and Fish Committee in the Senate?

"A. Senator Ledin.

"Q. In the 1953 session, did you have any functions relative to the Game and Fish program in the legislature?

"A. Yes; my instructions from Director Blair were to be available for appearance at all Game and Fish Committee meetings in the House and in the Senate. Each one of the bureaus, four, including myself as assistant director, were to be present unless otherwise instructed, I was to pay particular attention to the bills having reference to warden service, that is, the law enforcement angle of it.

"Q. Were those instructions subsequently modified?

"A. Yes sir.

"Q. When?

"A. I think that was late in January too, as I recollect when he said he had been contacted by Senator Ledin. And Senator Ledin didn't wish me to be present at any future meetings of the committee. Therefore, he would take care of the meetings and I was to appear as usual at the meetings before the House Committee.

\* \* \* \* \*

"Q. Had you at that time appeared before any of the appropriations committees, either the House or the Senate?

"A. No; Director Blair and Mr. Wollan took care of that.

"Q. Or any of the sub-committees?

"A. Not on appropriations.

"Q. Were you ever at any time called before any of those committees during the 1953 session?

"A. You mean the appropriation committees?

"Q. Or their sub-committees.

"A. No, sir."

From this testimony plaintiff would have us hold that the rider attached to the appropriations bill was passed as a result of hostility on the part of members of the senate. In order to hold that the rider is a bill of attainder we would have to go much further than that and hold that it was intended as punishment for a crime or at least for some act which the legislature believed deserved punishment. Here, again, the journal entries of the house and senate fail to substantiate any such claim.

Under our constitution, appropriation bills must originate in the house. The journals of the house and senate for 1953 show the fol-

lowing action taken on this appropriation bill. House File No. 1885, containing, among other things, the appropriations for the conservation department, was introduced April 9, 1953,[9] and passed by the house on April 13,[10] and contained the rider involved here.[11] A companion bill, Senate File No. 1716, was introduced in the senate on April 13.[12] It did not contain the proscriptive rider.[13] On April 15, after the second reading of Senate File No. 1716,[14] the senate finance committee reported out House File No. 1885, which had been introduced in the senate on April 14,[15] and recommended its amendment by striking out of House File No. 1885 all that part subsequent to its enacting clause and inserting in lieu thereof Senate File No. 1716.[16] The suggested amendment and the report were adopted.[17] Immediately thereafter, House File No. 1885 was substituted for Senate File No. 1716 and given the second reading.[18] Following the third reading of House File No. 1885 in the senate, a motion was made by Senator Wahlstrand to amend the senate version of House File No. 1885 by striking the rider, but the motion was rejected 14 to 36.[19] House File No. 1885, as amended by a conference committee appointed at the request of the house,[20] was passed April 20 by both houses after the adoption of the conference committee report containing the full text of House File No. 1885, including the rider.[21]

---

[9]Journal of the House, 1953, p. 1825.

[10]Journal of the House, 1953, p. 2053.

[11]See, Engrossed Bill.

[12]Journal of the Senate, 1953, p. 1802.

[13]See, Engrossed Bill, p. 26.

[14]Journal of the Senate, 1953, p. 1803.

[15]Journal of the Senate, 1953, pp. 1820, 1821.

[16]Journal of the Senate, 1953, p. 1883.

[17]Journal of the Senate, 1953, p. 1883.

[18]Journal of the Senate, 1953, pp. 1883 to 1884.

[19]Journal of the Senate, 1953, pp. 1899 to 1901.

[20]Journal of the Senate, 1953, p. 2005.

[21]Journal of the Senate, 1953, pp. 2283 to 2332; see, also, Journal of the House, 1953, pp. 2462 to 2511.

It therefore appears that the rider was no mere whim of the legislature but was thoroughly considered by both the senate and the house and certainly was considered by the appropriation committee of the house and the finance committee of the senate, in neither of which plaintiff had made any appearance, according to his own testimony.

Punishment being an essential element of a bill of attainder,[22] it would be difficult to spell into this record any act of plaintiff which would constitute either a crime or an act which the legislature wished to punish.

Much has been written about the decision in the Lovett case. Apparently it has rekindled the interest of many students and legal scholars of this country in the constitutional proscription against bills of attainder.[23]

It would seem clear that a legislative act may be a bill of attainder, even though the party or parties against whom it is aimed are not named,[24] if it can be ascertained against whom it is aimed. It is also true that the legislature may not use a constitutional power to accomplish an unconstitutional result. But, no matter how liberally we apply these rules, the act here involved, on the state of the record before us, cannot be held to be a bill of attainder. It is simply an act refusing to appropriate money for the salary of a named office, no matter who holds the office and nothing more.

Unlike the congressional act involved in the Lovett case, which effectively barred the individuals named from holding any position in the federal service, the act now before us does not prevent plaintiff from holding any position whatsoever. He could have been promoted

[22]See, Garner v. Board of Public Works, 341 U. S. 716, 71 S. Ct. 909, 95 L. ed. 1317.

[23]For law review notes and articles, see 46 Col. L. Rev. 849; 95 U. of Pa. L. Rev. 80; 33 Va. L. Rev. 88; 21 Tulane L. Rev. 278; 45 Mich. L. Rev. 98; 8 Alabama Lawyer 197; 26 Ore. L. Rev. 78; Reppy, *The Spectre of Attainder in New York*, 23 St. John's L. Rev. 1, 243; Dolan, *Evolution of the Bill of Attainder in the United States*, 2 Catholic U. of America L. Rev. 27; 63 Yale L. J. 844; 31 Neb. L. Rev. 429.

[24]United States v. Lovett, 328 U. S. 303, 66 S. Ct. 1073, 90 L. ed. 1252; Garner v. Board of Public Works, 341 U. S. 716, 71 S. Ct. 909, 95 L. ed. 1317.

to director, had there been a vacancy in that office, or he could have been appointed to any position other than the one which he held. He was given a position of a lower rank on his own application. Conversely, the act applied as well to anyone else who may have been appointed to the position of assistant director while the act continued in existence. If, for instance, a vacancy in that position had occurred by resignation or death during the biennium, the act would apply with equal vigor to any new appointee.

Nor is this the only instance in which the legislature has used this method of curtailing expenditures. L. 1953, c. 741, like previous appropriation acts, contains many directives as to how appropriations may be used. In § 21 we find a rider, substantially the same as the one here involved, pertaining to the railroad and warehouse commission. It reads:

"Provided, that no part of the amount allowed for salaries shall be paid for the salary of an Assistant or Special Assistant Attorney General."

The same provision appears in the 1951 laws. Ex. Sess. L. 1951, c. 1, § 21.

The question of whether an act of congress or a state legislature is a bill of attainder has most frequently arisen in cases involving an expurgatory oath of one kind or another.[25] Even in this field, all such acts are not bills of attainder.[26]

Much of what has already been said applies equally to a determination of whether the act involved is an *ex post facto* law. Bills of attainder historically often involve *ex post facto* laws and it probably was for that reason that they were dealt with together in framing our constitution. An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed.[27]

---

[25]See, Annotation, 18 A. L. R. (2d) 275.

[26]See, Garner v. Board of Public Works, 341 U. S. 716, 71 S. Ct. 909, 95 L. ed. 1317.

[27]Fletcher v. Peck, 10 U. S. (6 Cranch) 87, 138, 3 L. ed. 162, 178; Cummings v. State of Missouri, 71 U. S. (4 Wall.) 277, 18 L. ed. 356.

Cooley, in his treatise on constitutional limitations, has this to say of *ex post facto* laws:

"At an early day it was settled by authoritative decision, in opposition to what might seem the more natural and obvious meaning of the term *ex post facto,* that in their scope and purpose these provisions were confined to laws respecting criminal punishments, and had no relation whatever to retrospective legislation of any other description. And it has, therefore, been repeatedly held, that retrospective laws, when not of a criminal nature, do not come in conflict with the national Constitution, unless obnoxious to its provisions on other grounds than their retrospective character."[28]

In the leading case of Calder v. Bull, 3 U. S. (3 Dall.) 386, 390, 1 L. ed. 648, 650, Mr. Justice Chase, speaking for the court, said:

"* * * The prohibition, in the *letter,* is not to pass any law *concerning, and after the fact;* but the plain and obvious meaning and intention of the prohibition is this; *that the Legislatures of the several states, shall not pass laws, after a fact done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it.* The prohibition considered in this light, is an *additional* bulwark in favour of the personal security of the subject, to protect his person from *punishment by legislative acts,* having a retrospective operation. I do not think it was inferred to secure the citizen in his *private rights,* of either *property,* or *contracts.* * * *

"I will state *what laws* I consider *ex post facto laws,* within the *words* and the *intent* of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a crime, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.* * * * In my opinion, the true distinction is between *ex post facto laws,*

---

[28] 1 Cooley, Constitutional Limitations (8 ed.) p. 541.

and *retrospective laws.* Every *ex post facto law* must necessarily be *retrospective;* but every *retrospective law* is not an *ex post facto law:* The former, only, are prohibited."

Story, in his commentaries on the constitution, says:

"* *. * The terms, *ex post facto* laws, in a comprehensive sense, embrace all retrospective laws, or laws governing or controlling past transactions, whether they are of a civil or a criminal nature. And there have not been wanting learned minds, that have contended, with no small force of authority and reasoning, that such ought to be the interpretation of the terms in the Constitution of the United States. As an original question, the argument would be entitled to grave consideration; but the current of opinion and authority has been so generally one way, as to the meaning of this phrase in the State constitutions, as well as in that of the United States, ever since their adoption, that it is difficult to feel that it is now an open question. (*a*) The general interpretation has been, and is, that the phrase applies to acts of a criminal nature only; (*b*) and that the prohibition reaches every law, whereby an act is declared a crime, and made punishable as such, when it was not a crime when done; or whereby the act, if a crime, is aggravated in enormity or punishment; or whereby different, or less evidence, is required to convict an offender than was required when the act was committed."[29]

Substantially the same definition is found in 3 Dunnell, Dig. (3 ed.) § 1648.

This interpretation of the *ex post facto* proscription in the constitution has been adhered to up to the present day. In Galvan v. Press, 347 U. S. 522, 531, 74 S. Ct. 737, 742, 98 L. ed. 911, 922, Mr. Justice Frankfurter, speaking for the court, said:

"* * * And since the intrinsic consequences of deportation are so close to punishment for crime, it might fairly be said also that the *ex post facto* Clause, even though applicable only to punitive legislation, should be applied to deportation.

---

[29] 2 Story, Constitution (5 ed.) § 1345.

"* * * whatever might have been said at an earlier date for applying the *ex post facto* Clause, it has been the unbroken rule of this Court that it has no application to deportation."[30]

See, also, 16 C. J. S., Constitutional Law, § 435. Even in the Lovett case, Mr. Justice Frankfurter, in his concurring opinion, said (328 U. S. 323, 66 S. Ct. 1082, 90 L. ed. 1263):

"* *. * No one claims that § 304 is an *ex post facto* law."

Plaintiff cites State ex rel. Coduti v. Hauser, 219 Minn. 297, 17 N. W. (2d) 504, apparently in support of his position that this act is an *ex post facto* law. What we said there had no relation to *ex post facto* laws proscribed by our state or federal constitutions. The term *"ex post facto"* was used in reference to a rule of the civil service commission. It was held to be unfair largely on the basis of the old admonition that it is unfair to change the rules in the middle of the game.

On the state of the record before us, it cannot be held that this act is an *ex post facto* law.

■■■ The next ground upon which the act was declared unconstitutional by the trial court is that it violates the provisions of state and federal constitutions forbidding passage of acts impairing the obligation of contract. The gist of the argument, as we understand it, is that, once an employee of the state has acquired a civil service status, he has property or contract rights in his job and the legislature can do nothing to interfere with it. We need not spend time on the cases holding that subordinate branches of government cannot interfere with rights of civil service employees without following the civil service law. Subordinate branches of government, acquiring

---

[30]As a footnote to the above statement we find the following in the opinion of the court:

"First in Ogden v. Saunders, 12 Wheat. 213, 271, and again in Satterlee v. Matthewson, 2 Pet. 380, 681 (appendix), a characteristically persuasive attack was made by Mr. Justice Johnson on the view that the *ex post facto* Clause applies only to prosecutions for crime. The Court, however, has undeviatingly enforced the contrary position, first expressed in Calder v. Bull, 3 Dall. 386. It would be an unjustifiable reversal to overturn a view of the Constitution so deeply rooted and so consistently adhered to."

their rights and powers from the legislature, are bound by such acts of the legislature. We are not dealing with the powers of such branches of government here. This argument was also effectively answered early in our history by the United States Supreme Court. In Butler v. Pennsylvania, 51 U. S. (10 How.) 402, 417, 13 L. ed. 472, 479, the court said:

"* * * the appointment to and the tenure of an office created for the public use, and the regulation of the salary affixed to such an office, do not fall within the meaning of the section of the Constitution relied on by the plaintiffs in error; do not come within the import of the term *contracts*, or, in other words, the vested, private personal rights thereby intended to be protected. They are functions appropriate to that class of powers and obligations by which governments are enabled, and are called upon, to foster and promote the general good; functions, therefore, which governments cannot be presumed to have surrendered, if indeed they can under any circumstances be justified in surrendering them."

It seems well established by our own decisions that, unless otherwise proscribed by the constitution, the power to create an office includes the power to destroy it or abolish it,[31] and also to diminish the compensation for the office at the will of the legislature. Whatever may be the law in other states, it is firmly established in this state that a state employee, even though under civil service, has no vested right to his position. In State ex rel. Kane v. Stassen, 208 Minn. 523, 527, 294 N. W. 647, 649, we said:

"As a state employe relator did not have a vested right in his employment. Veterans, like others, could have been deprived of their positions by legislative abolition, and even if this were done after January 31, 1939, there would be no cause for relator to complain."

In Reed v. Trovatten, 209 Minn. 348, 352, 296 N. W. 535, 537, we again said:

"* * * A public officer or employe appointed pursuant to statutory authority does not have a vested right to continuance in his

---

[31]See, Annotation, 4 A. L. R. 220.

position. The legislature may abolish and modify any civil service or preference right which it has granted as well as the remedies for enforcement of the same. State ex rel. Kane v. Stassen, 208 Minn. 523, 294 N. W. 647. Hence, the legislature had the power to abolish relator's civil service status which he claims under prior laws."

We must keep in mind that we are not here dealing with the rights of civil service employees holding positions under subordinate branches of government, but we are dealing with an employee holding a position created by the legislature. There being no vested right in the position, it is difficult to see how either abolition or interference with the right could involve the impairment-of-contract clause of the constitution.

■ Plaintiff next contends that the act is unconstitutional for the reason that it seeks to force removal of a state officer in the executive branch of the government for reasons other than malfeasance or nonfeasance in the performance of his duties. This contention, it would seem, is based on the erroneous premise that the legislature may not interfere with any position in the executive branch of the government. If, as it has been pointed out above, the legislature may abolish an office which it has created, it is difficult to see how this contention can be sustained. The department of conservation was created by statute.[32] Authority to employ assistants is found in § 84.025, subd. 5. Furthermore, under Minn. Const. art. 4, § 11, the governor had the power to strike out any item of the appropriation bill. Ostensibly, he could have vetoed the provision here involved. He did not return the item to the legislature, which he could have done under his constitutional powers. It must therefore be assumed that he concurred in the action of the legislature. The legislature, by the act creating a special game and fish fund into which go designated income, has seen fit to retain control of appropriations therefrom in the specific language of § 97.49, subd. 1, which contains the following provision:

[32]See, M. S. A. c. 84.

"* * * all such moneys [that is, moneys deposited in the special game and fish fund] are hereby annually appropriated for the maintenance and conduct of the activities of the division, subject, however, to any special provisions which may be contained from time to time in appropriation acts."

We see no merit to this contention.

■ The trial court next found that the act was arbitrary, unreasonable, and despotic and that it deprives plaintiff of the equal protection of the law and his liberty and property. There is nothing in the record to sustain such conclusion, nor is it sustained by the court's finding.

In the trial of the case, plaintiff offered exhibit A, a circular letter, written by the commissioner of conservation and apparently circularized throughout the state, calling the attention of interested people to the fact that the conservation subcommittee of the senate finance committee proposed to do three things which he claimed would be detrimental to the department. They were:

"(1) Cut in warden service;
"(2) Game and fish contingent fund;
"(3) Elimination of assistant director of game and fish."

He further stated that the proposal was to cut the game warden service from the present force of 152 men to 140. It was also proposed to *eliminate* "the position of assistant director of the Division of Game and Fish."

If the legislature had adopted both proposals 1 and 3, it is difficult to see how the assistant director would have any more legal grounds to complain of his elimination than would the game wardens on whom the ax might fall. Both would lose their positions by the same method, namely, failure to appropriate money with which to pay their salaries. We believe, however, that no one would contend that a reduction in the game warden force by this method would violate any constitutional limitations placed on the legislature. If so, it would seem to follow that the same is true of one position as the other. It frequently occurs, after sessions of the legislature, that some department, and sometimes all of them, must cut its force by virtue of the

fact that the legislature has refused to appropriate the money which the department feels it should have. The recommendations of the commissioner in the circular letter were as follows:

"(1) A total complement for the warden service of 162 (or at least 152, as at present), with whatever allowance may be necessary for the proposed supervisory reorganization plan.

"(2) Game and fish contingent fund of at least $400,000 per year;

"(3) Continuance of the position of assistant director of the Division of Game and Fish."

It would seem from this letter, as well as from the letter of Frank D. Blair to plaintiff notifying him of his layoff, that both considered that the action of the legislature amounted to an abolition of the position of assistant director of game and fish.

The last finding of the trial court is that the act attempts to abolish the officer without abolishing the office. Apparently it is conceded under this finding that the legislature could have abolished the office. The question here posed is whether it can refuse to appropriate money for the salary of a named officer entirely. Here, again, it is difficult to distinguish between the rights of plaintiff and those of the game wardens who would be affected by a layoff due to failure to appropriate enough money to retain the force then employed.

The cases cited by plaintiff in support of this contention are not in point. They do not involve the question of the constitutionality of an act of the legislature in failing to appropriate money to pay salaries of state employees. The Colorado case of People ex rel. Fulton v. O'Ryan, 71 Colo. 69, 204 P. 86, dealt with the failure of the legislature to appropriate money for the salary of an officer created by the constitution. We are not here dealing with the question whether the legislature may refuse to appropriate money for the payment of salaries of constitutional officers. Many of the other cases deal with actions of subordinate branches of government, and others deal with acts in which an office was abolished under subterfuge of creating a new office performing the same functions. That is not true under the act here involved. The assistant director was eliminated and, for all practical purposes, the office was abolished temporarily by failure to

appropriate money to pay the salary of that official. The record here is completely devoid of any evidence that the motive of the legislature in so doing was anything but a proper one. Certain newspaper articles indicating some improper motive were offered in evidence. These articles were rejected by the trial court, after which he said:

"I am of the opinion, at least for the purposes of considering the issues raised in the pleadings, that the objection should be sustained and I sustain the objection. But I do think these should be a part of the record. So, if this matter is reviewed, the Court will have an entire content of the material offered. That will be the ruling. Objection sustained, and they will be made a part of the record in this trial."

The offered evidence, having been rejected, is no part of the record here and may not be considered by us. The only purpose it could possibly serve might be to arouse some suspicion in the minds of the members of this court as to the propriety of this act of the legislature. Whatever suspicions may be entertained by the members of this court cannot, however, be used as the basis for declaring an act of the legislature unconstitutional. The usual rules apply to this case. There is a strong presumption that acts of the legislature are constitutional, and it is only when the evidence is clear that the court will declare an act of the legislature in violation of the constitution.

On the state of the record before us, we cannot find that any of the grounds upon which the trial court concluded that this act was unconstitutional are tenable. It must therefore be held that the act does not violate the constitution and that it is for all purposes valid.

In view of our holding on the constitutional question we need not determine other questions raised by defendants. Whether plaintiff is estopped from questioning the constitutionality of the act by virtue of his acceptance of a position in the classified civil service of lower rank we need not determine. Neither do we pass upon the question whether a failure to appeal from his layoff to the civil service board was a prerequisite to bringing this action in court. It is generally held that an administrative tribunal, such as the civil service board,

is not equipped, nor does it have the power, to pass upon the constitutionality of an act of the legislature. In the absence of such power, an appeal to it would be futile. Ordinarily, where nothing can be accomplished by resort to administrative remedies, the doctrine of exhaustion of administrative remedies does not apply.[33]

Neither do we pass on the question whether failure to apply to the legislative advisory committee for funds to pay the salary of an assistant director out of the fund of $500,000 appropriated for the purpose of supplementing any requirements of the division of game and fish for salaries, supplies, and expenses should bar this action. Why such application was not made we have no way of knowing. Certainly, the legislative advisory committee had power to grant such request had it been made. If it had done so, this litigation could have been avoided.

It should be said in passing that it is not for us to determine the wisdom of the legislation involved. Whether our sympathies lie with plaintiff is beside the point. Our function is to confine our decision to a determination of the constitutionality of the act before us. A matter of this kind is of too great importance in preserving the proper function of the judicial branch of government as a check upon the legislative to permit our judgment to be influenced by our sympathies for any one individual no matter how deep those sympathies may run. While we should not hesitate to strike down an act of the legislature when it fails to heed the limitations placed upon it by the constitution, we should be equally careful not to interfere with any power it has, no matter what we personally may think about the wisdom of the legislation involved. Finding no constitutional barrier to the act in question, we must reverse the judgment.

Reversed.

---

[33]See, Davis, Administrative Law, § 190, p. 631. For a note on the question whether an administrative bureau is competent to determine the constitutionality of an act of the legislature, see 30 Harv. L. Rev. 386.