**In the Matter of the Application by MILTONA STATE BANK, Miltona, for Establishment of a Detached Facility in Long Prairie, Minnesota.**

No. CX–87–1213.

Court of Appeals of Minnesota.

Nov. 10, 1987.

Review Denied Jan. 20, 1988.

David L. Graven, Minneapolis, for petitioner First Nat. Bank of Long Prairie.

Hubert H. Humphrey, III, Atty. Gen., Gregory P. Huwe, Sp. Asst. Atty. Gen., St. Paul, for respondent Com'r of Commerce.

Kent G. Harbison, Minneapolis, for respondent Miltona State Bank.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LOMMEN *, JJ.

## OPINION

LOMMEN, Judge.

This appeal was taken by writ of certiorari from an order issued by the Commissioner of Commerce on June 3, 1987. The order of the Commissioner was issued pursuant to Minn.Stat. § 47.521 (1986). Concurrently, petitioner submitted a motion for stay of the order and a petition for writ of prohibition. The court denied both.

The Commissioner approved an application to establish a detached facility in Long Prairie, Minnesota, subsequent to the failure of the Todd County State Bank (Todd County Bank), Long Prairie, and its closing by the Commissioner of Commerce. Prior to issuing the order, the Department of Commerce, through its agent Federal Deposit Insurance Corporation (FDIC), invited petitioner and other banks to bid on deposits and assets of the failed bank. Petitioner was the successful bidder.

Without notice to petitioner, the Commissioner of Commerce immediately authorized Miltona State Bank (Applicant), an unsuccessful bidder for those same assets and deposits, to locate a detached facility within one and one-half blocks of petitioner's office. The Commissioner claimed authority to waive requirements of Minn.Stat. § 47.52(a) (1986) by relying on the "closed bank" provision of Minn.Stat. § 47.521 (1986). Petitioner contends section 47.521 cannot be invoked where all services of the failed bank continue to be provided on the same terms and, therefore, there has been no loss of banking services.

Petitioner argues the Commissioner exceeded his authority because (1) the circumstances of this case were neither contemplated by the legislature nor addressed by the language of statute, and (2) the Commissioner unilaterally amended section 47.521 to include a waiver which the legislature explicitly omitted from that provision. We agree.

* Acting as judge of the court of appeals by ap-

## FACTS

First National Bank of Long Prairie (First National) is a national banking corporation with its home office located in Long Prairie, Minnesota. Todd County Bank, formerly State Bank of Grey Eagle, commenced business on June 13, 1924, and was chartered as a state bank in Grey Eagle, Minnesota on July 2, 1934. The bank was relocated May 6, 1983 to Long Prairie, with its former site in Grey Eagle retained as a detached facility. The bank was closed by the Department of Commerce on May 14, 1987. First National purchased certain assets and assumed certain liabilities of the closed bank from the FDIC, the receiver.

Applicant started business on November 8, 1916 as a state bank, and now has its principal banking office at Oak Street and County Highway 14 in Miltona, Minnesota. Applicant does not operate detached facilities other than the Long Prairie facility.

Long Prairie is a rural community county seat in Todd County and is located 25 miles east of Miltona, Minnesota. The 1983 estimated population was 3,012. The town serves a central trade area for Todd County, which has a population estimated at 26,010. From 1970 to 1980, Todd County grew by 13% and Long Prairie grew by 18%.

Todd County Bank failed this year, triggering the following series of events: On May 14, 1987, the Commissioner ordered the appointment of the FDIC to act as receiver for Todd County Bank; that same day the FDIC received bids from three banks which had been invited to purchase the assets and deposits of Todd County Bank. First National bid $419,000, Applicant bid $401,500; and Green Lake State Bank of Spicer bid $236,000. The FDIC extended invitations to bid only to banks having sufficient capital and capacity to fully serve Todd County Bank customers. First National won the bid and immediately entered into a purchase and assumption agreement (Agreement). The Agreement required First National to provide services

pointment pursuant to Minn. Const. art. 6, § 2.

to all Todd County Bank customers on the same terms and at the same charges imposed by Todd County Bank. Furthermore, First National agreed to take over the servicing of Todd County Bank accounts without interruption to any customers of the failed bank. First National complied with these terms.

At 3:00 p.m. on May 15, 1987, Todd County Bank closed its doors. The following morning, May 16, 1987, First National began servicing the accounts, loans and other needs of former Todd County Bank customers from First National's office in Long Prairie.

On May 20, 1987, six days after making its unsuccessful bid on Todd County Bank's assets and deposits, Applicant filed an application with the Commissioner to establish a detached banking facility in Long Prairie. At this time, the Commissioner received numerous letters from Long Prairie residents requesting the Commissioner to approve the detached facility. A majority of the letters were from former disgruntled customers of First National. Applicant, a subsidiary of the Twin Cities-based holding company The Tyson Corporation, has its main office in Miltona, 25 miles west of Long Prairie.

On June 3, 1987, the Commissioner issued an order approving Applicant's detached facility. First National did not have prior notice of the Commissioner's deliberation on this matter. The order was made pursuant to Minn.Stat. § 47.521 waiving the substantive requirements of Minn.Stat. § 47.54 (1986). First National did not consent to the establishment of Applicant's detached facility in Long Prairie under the "home office protection rule." Minn.Stat. § 47.52 (1986).

On July 8, 1987, the FDIC approved of insurance for Applicant. On July 13, 1987, Applicant opened its branch office in Long Prairie.

## ISSUE

Do the emergency powers of Minn.Stat. § 47.521 allow the Commissioner of Commerce to approve a detached banking facility in a community already served by a bank?

## ANALYSIS

1. Appeal is governed by the Administrative Procedure Act, Minn.Stat. § 14.69 (1986), which provides:

In judicial review under sections 14.63 to 14.68, the Court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

a. In violation of constitutional provisions; or

b. in excess of the statutory authority or jurisdiction of the agency; or

c. made upon unlawful procedure; or

d. affected by other error of law; or

e. unsupported by substantial evidence in view of the entire record as submitted; or

f. arbitrary or capricious.

The notice and approval procedures for detached banking facilities provide in part:

Any proceedings for judicial review of an Order of the Commissioner issued under this subdivision without a contested case hearing shall be conducted pursuant to the provisions of the Administrative Procedure Act relating to judicial review of agency decisions * * *.

Minn.Stat. § 47.54, subd. 2 (1986).

Petitioner argues the Commissioner's order in this matter was both in excess of his statutory authority and arbitrary or capricious, therefore subject to reversal by this court under Minn.Stat. § 14.69(b) and (e). Respondent argues this court should defer to an administrative determination the agency acted legally. *Reserve Mining v. Herbst*, 256 N.W.2d 808, 825 (1977) (agency order entitled to a presumption of validity unless and until it is overturned by the reviewing courts). We have acknowledged this principle can extend to matters not subject to prior judicial construction. *Minnesota Life & Health Insurance Guaranty Association v. Department of*

*Commerce,* 400 N.W.2d 769, 773 (Minn.Ct. App.1987). However, in *Minnesota Life,* the court of appeals was faced with a case of first impression involving interpretation of a statute subject to two reasonable interpretations. *Id.* In such cases, the Minnesota Supreme Court has stated:

[A] statute is to be construed according to the legislative intent, which is to be sought in the language used, in light of the subject matter, the purpose of the statute, the occasion and necessity for the law, and the consequences of a particular interpretation.

*State v. Olson,* 325 N.W.2d 13, 19 (Minn. 1982) (quoting *Grudnosky v. Bislow,* 251 Minn. 496, 498, 88 N.W.2d 847, 850 (1958)). After reviewing the legislative history in *Minnesota Life,* this court concluded the record supported the conclusion of the Commissioner of Commerce. 400 N.W.2d at 775.

Petitioner argues although the standard of review for agency decisions is deferential, where the issue involved is the interpretation of a statute and the statutory language "is not exceedingly technical in nature such that only specialized agencies may be thought able to understand it," the Minnesota Supreme Court has found there is "no good reason for deferring to administrative expertise for its interpretation." *Minnesota Microwave, Inc. v. Public Service Commission,* 291 Minn. 241, 245, 190 N.W.2d 661, 665 (1971). Additionally, deference is not routinely accorded to agency interpretation when such interpretation is not longstanding. *Id.* Because the Commissioner's interpretation of the closed bank statute is not longstanding, and the statutory language is "phrased in common terms," *Minnesota Microwave,* 190 N.W.2d at 665, petitioner argues this court need not defer to the Commissioner's expertise for its interpretation. After carefully reviewing the legislative history and facts of this appeal, we agree.

The crux of this appeal is the emergency closed bank statute which reads in its entirety:

Where the commissioner has determined that an existing state bank or national banking association is about to fail or has failed and it is in the public interest to prevent the loss of banking services in the community affected, the limitations on location and number of detached facilities in Section 47.52 do not apply to an application to establish a detached facility in the same locality. In the event the commissioner has determined that it is necessary and in the public interest to act immediately on the application, the commissioner may waive the requirements of Section 47.54.

Minn.Stat. § 47.521 (1986). Petitioner argues this is a narrow exception to the prevailing substantive and procedural requirements of Minn.Stat. §§ 47.52 and 47.54. Those sections deal with the establishment of detached banking facilities. Minn.Stat. § 47.54 requires notice and approval procedures prior to the establishment of any detached banking facility. Commonly referred to as the home office protection rule, Minn.Stat. § 47.52(a) (1986) provides in pertinent part:

(a) With the prior approval of the commissioner, any bank doing business in this state may establish and maintain not more than two detached facilities provided the facilities are located within the municipality in which the principal office of the applicant bank is located; or within 5,000 feet of its principal office measured in a straight line from the closest points of the closest structures involved; or within 25 miles of its principal office measured in a straight line from the closest point of the closest structures involved, if the detached facility is within any municipality in which no bank is located at the time of application or if the detached facility is in a municipality having a population of more than 10,000, according to the last previous United States census, or if the detached facility is located in a municipality having a population of 10,000 or less and all banks having a principal office in the municipality have consented in writing to the establishment of the facility.

*Id.* Such home office bank has the absolute power to veto establishment of a branch bank in its community. *Applica-*

*tion of Larson,* 350 N.W.2d 363, 366 (Minn. 1984) (if a bank withholds its consent, there is no opportunity for hearing or any review by the commission); *Matter of Change in Corporate Title,* 372 N.W.2d 79, 81 (Minn. Ct.App.1985).

 Petitioner argues the language of Minn.Stat. § 47.521 is ambiguous because the phrases "to prevent the loss of banking services" and "limitations on location and number" are ambiguous and should be construed as the legislature intended. The language of a statute does not have to be technical to be ambiguous. The criterion for ambiguity is whether the statute can be given more than one reasonable interpretation. Minn.Stat. § 645.16 (1986); *Tuma v. Commissioner of Economic Security,* 386 N.W.2d 702 (Minn.1986) ("actually" or "constructively paid" is ambiguous). When a statute is ambiguous, the reviewing court must determine the probable legislative intent and give the statute a construction that is consistent with that intent. *Beck v. City of St. Paul,* 304 Minn. 438, 445, 231 N.W.2d 919, 923 (1975). Petitioner notes "loss of banking services" is not defined in the statute. Further, petitioner argues the word "location" means no more in the context of Minn.Stat. § 47.521 than it does in common usage; it refers only to "where" branch banks can be placed in proximity to their home offices and not to "whether" consent is a prerequisite to establishing branch banks as respondent suggests.

Respondent contends Minn.Stat. § 47.521 is a clear and relatively simple statute and does not require an inquiry into the legislative history. We disagree. "Loss of banking services" connotes more than one meaning and is ambiguous. Therefore, given the ambiguity and because this is a case of first impression, a reviewing court must look past the ambiguous language of the statute. *Olson,* 325 N.W.2d at 19; *Minnesota Life,* 400 N.W.2d at 773.

The emergency powers of section 47.521 are applicable only where there is a failure of the only bank in town, or under its broadest reading, where the services of a failed or failing bank are not picked up by another bank through other means. The legislative history of section 47.521 indicates the emergency powers are distinctly limited to situations where there is a failure of the only bank in town.

The legislature enacted section 47.521 in 1983 in response to the failure of the only bank in Barnum, Minnesota. The legislative hearings indicate:

> [W]hat the Senate File [996] references is the closing of the state bank in Barnum that happened earlier this year. As a result of that closing that local community was left without any banking services whatsoever from between 30 to 45 days.

The "Barnum Bill" proposed to remedy this unwarranted risk for residents of one-bank towns. According to the legislative history, it thus amended:

> state law to allow the state banking commissioner the authority to supercede the present statutory hearing requirement and allows the immediate response to allow a new facility in any further incidents that are similar to what happened in Barnum, Minnesota.

Petitioner argues every mention of the Barnum Bill's effect includes the qualifier that it is to apply "in any further incidents that are similar to what happened in Barnum." As stated by the subcommittee on financial institutions:

> I am sure members of this committee who are part of the banking subcommittee are aware of the limited number of situations, the emergency situations, in which that occurs.

Further comments state, "I believe that this is a bill that is going to respond to a situation we unfortunately faced recently in Barnum, and provide different options and opportunities to respond to that crisis."

Petitioner contends Long Prairie is not the type of community section 47.521 addresses. It has an existing bank which immediately picked up the services of Todd County Bank. It has a full service savings and loan which, under current deregulation, can perform many of the functions of a bank, and also a full service state bank seven miles north of Long Prairie. Respondent argues if the court has any doubt

about statutory meaning, the Commissioner's interpretation must prevail. Respondent asserts a quick reading of the statute is enough to dispel any of petitioner's arguments. We disagree. Because section 47.521 is ambiguous, the court is not required to defer to the Commissioner's findings. *See Olson*, 325 N.W.2d at 19; *Minnesota Life*, 400 N.W.2d at 773.

Respondent contends the statute authorizes the Commissioner need only determine any loss of banking services has occurred and it is in the public interest to prevent the loss. The legislative history contradicts the argument the statute is operative upon finding a de minimis loss of services.

Respondent argues the legislative history indicates the primary purpose of the bill was to promote competitive equality between national and state banks. This argument is without merit. Respondent bases this argument in part upon an affidavit from a Commerce Department employee stating the purpose of Minn.Stat. § 47.521. This is improper under *Starkweather v. Blair*, 245 Minn. 371, 379–80, 71 N.W.2d 869, 875–76 (1955) (the motives of the legislative body in executing any particular legislation are not the proper subject of judicial inquiry). Only contemporaneous legislative history can be used to discern the statute's meaning. *See id.*

Petitioner argues under the broadest reading of section 47.521 there must be a loss of banking services evidenced by the unwillingness of other banks to assume the failed or failing bank's structure. Petitioner contends the legislature was emphatic in expressing its intent the Barnum Bill serve as a solution to situations where "there are no banks willing to assume the present structure of a failing bank." Loss of competition is not an emergency. Unlike Barnum, where no other bank stepped in to pick up services of the failing bank, in this case First National immediately assumed the obligations of the failed Todd County Bank under the authority of the Commissioner and the FDIC. After researching the legislative history of the Barnum Bill, we find there is nothing to suggest section 47.521 was meant to have any broader application than to preserve banking services in one-bank towns.

■ Petitioner argues Minn.Stat. § 47.521 does not waive the home office protection rule. Nothing in the legislative history indicates the consent requirement is waived. Petitioner contends any doubts are resolved through a comparison of Minn. Stat. § 47.521 with §§ 49.34 and .36.

Minn.Stat. § 49.34 provides in pertinent part:

**Consolidation of state banks or trust companies procedure.**

Where the commissioner has determined that a merger, consolidation or purchase of assets and assumption of liabilities is necessary and in the public interest to prevent the probable failure of a state bank or national banking association, the limitations on location and number of detached facilities in section 47.52 shall not apply to the establishment of a detached facility directly resulting from such acquisition. The establishment of a detached facility in order to prevent the probable failure of a bank as provided in this subdivision shall not require the written consent of banks having a principal office in the municipality in which the resulting detached facility will be located, notwithstanding the provisions of section 47.52.

Section 49.36 provides in pertinent part:

**Approval by Commissioner.**

**Subd. 2. Procedures.** The procedures contained in section 47.54 must also be adhered to when a merger, consolidation, or purchase of assets and assumption of liabilities is effected pursuant to section 49.34, subdivision 2. In the event the commissioner has determined that it is necessary and in the public interest to act immediately on a merger, consolidation or purchase of assets and assumption of liabilities to prevent the probable failure of a bank, the commissioner may waive the requirements of section 47.54.

*Id.*

Petitioner argues section 49.34 specifically provides for the requirements of section

47.52, while section 47.521 does not. This provides compelling evidence the legislature intended to retain the home office protection rule for purposes of section 47.-521. *See Van Asperen v. Darling Olds, Inc.*, 254 Minn. 62, 73–74, 93 N.W.2d 690, 698 (1958) (in determining legislative intent, court is to read the statute as a whole and to interpret various provisions of the same statute in light of each other); *People for Environmental v. Minnesota Environmental*, 266 N.W.2d 858, 866 (Minnesota Supreme Court follows a policy of harmonizing statutes dealing with the same subject matter).

Respondent argues the home office protection rule is a "limitation on location" of detached facilities and is therefore waived by Minn.Stat. § 47.521. Respondent asserts because Minn.Stat. § 47.521 necessarily waives all limitations on location and number of detached facilities, and because the home office rule is a rule of only location, it is waived. We disagree. There is no mention of this result in the legislative history. If the legislature intended this, it should have done so explicitly.

### DECISION

Minn.Stat. § 47.521 does not apply to communities served by more than one bank and does not waive the home office protection rule.

Reversed.