[L. A. No. 21166. In Bank. Nov. 17, 1950.]

HOLLYWOOD TURF CLUB (a Corporation), Respondent, v. EDWIN M. DAUGHERTY, as Commissioner, etc., Appellant.

Fred N. Howser, Attorney General, Walter L. Bowers, Assistant Attorney General, and James A. Doherty, Deputy Attorney General, for Appellant.

Desmond & Desmond and Gerald Desmond for Respondent.

CARTER, J.—Petitioner, a corporation engaged in horse racing enterprises, was organized in 1935, with an authorized capital of 5,000 shares of non par value common stock and 5,000 shares of preferred stock with $100 par value. Its articles were amended from time to time increasing the number of shares culminating in 1947 with an authorization for 60,000 shares with a par value of $100 per share.

Prior to 1947 the corporate securities act gave the corporation commissioner power to prevent the further sale of securities by a corporation when such sale would be "unfair, unjust or inequitable," and authorized the adoption of rules and regulations to carry out the provisions of the act. (Stats. 1917, ch. 532, sec. 4, p. 676.) In that year the following was added to that section: "The commissioner may prescribe, by rules and regulations adopted after reasonable notice and a public hearing, the rights, preferences, privileges, restrictions and par value of securities proposed to be sold for the purpose of raising funds with which to finance racing enter-

prises authorized by law. Any par value so prescribed shall not exceed one thousand dollars ($1,000) per share." (Stats. 1947, ch. 1122, § 1; now Corp. Code, § 25511.) Pursuant thereto and upon notice the commissioner adopted a regulation stating that securities for funds for a horse racing enterprise shall be one class and have a par value of "at least" $1,000; that the rule shall apply to the original and subsequent finance of such an enterprise whether by sale for cash, the "capitalization of surplus" or by the issuance of securities in "any other manner."

Petitioner sought a permit from the commissioner to issue 29,997 shares of its capital stock as a stock dividend at a par value of $100 per share. Applying the foregoing rule, the commissioner denied the application for a permit because the par value was not $1,000 per share.

On November 9, 1948, petitioner commenced a proceeding in mandamus to nullify the denial of its application. Defendant raised the question of the timeliness of the mandamus proceeding. Petitioner asserted that section 25511 of the Corporations Code, quoted *supra,* and the regulation, *supra,* were invalid as denying equal protection and that they did not apply to the issuance of a stock dividend. The trial court found that the proceeding was timely commenced; that section 25511 is unconstitutional and that it does not apply to the issuance of stock as a dividend such as we have here.

The Corporate Securities Act provides that every order of the commissioner shall be subject to review in accordance with law. (Corp. Code, § 25317.) "Except for review of proceedings conducted in accordance with Chapter 5 of Part 1 of Division 3 of Title 2 of the Government Code, a written petition praying that the order, decision, permit, or evidence of other official act be issued, modified, or set aside in whole or in part may be filed in the superior court of the State of California, within sixty days after the issue of the order, decision, permit, or evidence of other official act of the commissioner or after completion of application to the commissioner and failure or refusal of the commissioner to act upon the application." (Corp. Code, § 25318.) The portion of the Government Code to which reference is made is the administrative procedure law. Such law deals with the time in which administrative determinations may be judicially reviewed by the courts as follows: "Except as otherwise provided.in this section any such petition shall be filed within 30 days after the last day on which reconsideration can be ordered . . . The

complete record of the proceedings, or such parts thereof as are designated by the petitioner, shall be prepared by the agency and shall be delivered to petitioner, within 30 days after a request therefor by him, upon the payment of the expense of preparation and certification thereof . . . Where petitioner, within 10 days after the last day on which reconsideration can be ordered, requests the agency to prepare all or any part of the record the time within which a petition may be filed shall be extended until five days after its delivery to him." (Gov. Code, § 11523.) Reconsideration may be ordered "30 days after the delivery or mailing of a decision to respondent." (Gov. Code, § 11521.) There is a dispute between the parties as to whether the 60-day limit in the Corporate Securities Act or that prescribed by the Administrative Procedure Act controls. The argument revolves around the question of whether the proceedings before the commissioner were conducted in accordance with the Administrative Procedure Act or other procedure, and hence which limitation period applies. It is not necessary to decide that question, for we think that petitioner's petition was not timely filed under either statute. Certainly it was beyond the 60-day period mentioned in section 25318 of the Corporations Code.

Turning to the application of section 11523 of the Government Code, the chronology of events appears to be as follows: On July 29, 1948, the order of denial—the commissioner's decision—was served upon petitioner. The last day on which reconsideration could have been ordered was August 28, 1948. On that day petitioner requested the commissioner to prepare the record. On September 24, 1948, the commissioner notified petitioner by telephone and letter that the record requested was completed and the cost thereof was $117.53. The letter recited that: "Upon payment of the expense involved, the record is ready for delivery to you." Petitioner took no action until November 3, 1948, when the commissioner received from it a letter with a check for $117.53 for the record which the commissioner delivered to petitioner. The mandamus proceeding was commenced on November 9, 1948.

█ Under the foregoing circumstances, the time to commence the mandamus proceeding expired five days after—at least no more than—it would be reasonably possible to deliver to the commissioner the cost of the record and receive it; a transaction that should not have required over a month. This follows from the only reasonable construction of section 11523 of the Government Code. Clearly, the one seeking a review

thereunder—petitioner—is obligated to pay the cost of the record before he is entitled to it. If the five days commenced to run from the actual delivery of the record to the petitioner, regardless of when he was notified that it was ready for delivery to him, then he would have it in his power to extend the time indefinitely by a mere failure to pay the cost and accept delivery of the record. Such an unreasonable interpretation is to be avoided if possible. By the "delivery" of the record to him is meant an actual delivery or a substantial equivalent thereof, what might be termed a constructive delivery. When the record was ready and its cost fixed and petitioner was so notified, all that could be done by the commissioner had been done. The rest was up to petitioner and he did not act within a reasonable time, considering the circumstances, to obtain the actual possession of the record. The following rule .of law relating to limitations of actions is applicable. "When the plaintiff's right of action depends upon some act which he has to perform preliminarily to commencing the suit, and he is under no disability or restraint in the performance of such act, he cannot suspend indefinitely the running of the statute of limitations by a delay in performing such preliminary act, and that if the time within which such act is to be performed is indefinite or not specified, a reasonable time will be allowed therefor, and the statute will begin to run after the lapse of such reasonable time." (*Bass* v. *Hueter*, 205 Cal. 284, 287 [270 P. 958].) (See, also, *Woollomes* v. *Gomes*, 26 Cal.App.2d 461 [79 P.2d 728]; *O'Hair* v. *United States F. & G. Co.*, 9 Cal.App.2d 307 [49 P.2d 1129]; *D. A. Foley Co.* v. *State of California*, 119 Cal.App. 300 [6 P. 2d 283].)

It is no excuse that the payment for the record was delayed because petitioner waited for the next meeting of its board of directors. Nor is it important whether the commissioner was injured by the delay. It is a matter of interpretation of the statute which is clear enough. Compliance with its time requirements must be met. It is not to be supposed that they are merely directory.

On the issue of the validity of the statute (Corp. Code, § 25511, *supra*) and the regulation adopted pursuant thereto, *supra*, placing a minimum of $1,000 on the par value of stock proposed to be sold for the purpose of raising funds with which to finance racing enterprises, pertinent principles compel the conclusion that they are valid.

Section 337a of the Penal Code, as added in 1909

(Stats. 1909, p. 21) denounced as criminal, bookmaking and conducting betting on the speed or power of endurance of man or beast. It was held valid (*Matter of Brown,* 156 Cal. 632 [105 P. 739]), and has been amended from time to time and exists today in a more elaborate form. An initiative measure to license horse racing and permit gambling was proposed but defeated in 1926. (Stats. 1927, p. lxxxvi.) In 1933 the Constitution was amended authorizing the Legislature to regulate horse racing and horse race meetings and wagering thereon, thus singling out horse racing as in a class by itself. It also ratified an act regulating horse racing and betting thereon. (Cal. Const., art. IV, § 25a.) The act ratified, establishes a Horse Racing Board with comprehensive powers, and outlines detailed regulation of horse racing with wagering on the result, including the requirement of a permit for new tracks, licensing of those engaging in the enterprise, and providing for the suspension and revocation of licenses and the disposition of funds wagered on the result of such racing. (Stats. 1933, p. 2046; *Southern California Jockey Club* v. *California Horse Racing Board, ante,* p. 167 [223 P.2d 1].) That act has been amended (Stats. 1935, pp. 1586, 1943; Stats. 1937, pp. 67, 2292; Stats. 1939, ch. 594; moved to Bus. & Prof. Code, § 19400 et seq., Stats. 1941, ch. 47). Thus horse racing has been singled out as justifying special treatment by the people and the Legislature, and such classification has been held not to be a denial of equal protection of the laws. (*In re McKelvey,* 19 Cal.App.2d 94 [64 P.2d 1002]; *People* v. *Monroe,* 349 Ill. 270 [182 N.E. 439, 85 A.L.R. 605]; see *People* v. *Sullivan,* 60 Cal.App.2d 539 [141 P.2d 230]; *People* v. *Maddox,* 65 Cal.App.2d 45 [149 P.2d 739]; *State* v. *Saia,* 212 La. 868 [33 So.2d 665]; *Selectmen of Topsfield* v. *State Racing Commission,* 324 Mass. 309 [86 N.E.2d 65]; *Rohan* v. *Detroit Racing Assn.,* 314 Mich. 326 [22 N.W.2d 433, 166 A.L.R. 1246]; *State* v. *Garden State Racing Assn.,* 136 N.J.L. 173 [54 A.2d 916]; 85 A.L.R. 622.) It is said in *Selectmen of Topsfield* v. *State Racing Commission, supra,* 70 [86 N.E.2d]: "Horse racing with the pari-mutuel system of betting, which is what the respondent proposes to conduct at the Topsfield location, is a form of gambling which has been legalized by the Legislature but which because of the nature of the business can be abolished at any time that the Legislature may deem proper for the safeguarding and protection of the public welfare. The respondent has no complaint because, instead of prohibiting racing meetings, the Legislature only went to

the extent of subjecting the approval to a condition which the Legislature deemed necessary in the public interest." And in *State* v. *Garden State Racing Assn., supra,* 919 [54 A.2d] : "The business of operating racetracks or of dealing in intoxicating liquor, for example, requires statutory regulation for the general benefit of the public, when it would be impracticable or impolitic to impose the same upon other businesses. . . . The classification underlying such legislation must be reasonable. If the law be otherwise unobjectionable, all that can be required is that it be general in its application to the class or locality to which it may apply. It is then public in character and of its propriety and policy the legislature must be the judge." It has been said that: "This court, in the opinion of the writer, would be altogether too reserved in its opinion if it did not admit that it is a matter of common knowledge that wherever and whenever horse racing occurs, and especially when what is called race meets are held, there is betting in some form or other on the result." (*Utah State Fair Assn.* v. *Green,* 68 Utah 251 [249 P. 1016, 1029].) All of the foregoing factors point to the conclusion that horse racing and wagering on the result thereof are intimately related. Indeed, it may well be that without wagering, horse racing enterprises would have little success; that such enterprise is commonly placed in a class by itself; and that to fix the par value of the stock of corporations engaged in such business, as is done by the instant statute and regulation, is an incidental part of the regulation of the activity itself. The Legislature may have determined that it was necessary to have fewer stockholders which would result from a higher par value of the stock, in order that the activities of the corporation and its shareholders and their activities could be more easily scrutinized, all to the end that the horse racing law, together with the off track betting prohibition, could be administered adequately. Moreover, it might have considered that horse racing enterprises were hazardous business ventures because their life rests on the action of the electorate, Legislature, or horse racing board, and on dissolution, their major asset, a race track, would not have a ready market at its true value. Hence placing a higher par value on the stock would discourage its purchase by investors of small means who could ill afford to take the added risk involved. That such is a legitimate legislative objective was recognized in *Dillingham* v. *McLaughlin,* 264 U.S. 370, 374 [44 S.Ct. 362, 68 L.Ed. 742], where the court held valid a statute which permitted only corporations to

accept deposits of less than $500, and had this to say: "The distinction between the businesses of receiving small deposits and those above five hundred dollars is legitimate. The small sums generally come from people without much knowledge of such affairs. Whatever may be one's own opinion about the wisdom of trying to save the ignorant and rash from folly, it is a recognized power that is used in many ways. We had adverted to the element of chance in this very undertaking because it is one not likely to be realized by an applicant. This and the long delay and loss that may ensue upon any particular deposit would be sufficient warrant for the State's effort at least to bring such business under supervision and control, if not to prevent it altogether." Furthermore, the Legislature may have determined that as the horse racing business is especially hazardous, the function of the corporate securities law and the corporation commissioner in administering it to protect the public from fraud and ill advised investments, required that a high par value be fixed for stock of corporations engaged in such business, thus increasing the probability of a more careful preinvestment investigation by the prospective investor. It is not the function of this court to question the wisdom of the legislative classification and we must be guided by the principles that: " 'The question of classification is generally one for the legislative power, to be determined by it in the light of its knowledge of all the circumstances and requirements, and its discretion will not be overthrown unless it is palpably arbitrary . . . It will be presumed that the legislature made inquiry to determine whether or not there were evils to be remedied and that the classification made was based upon the result of the inquiry' . . . 'When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification.' " (*California Physicians' Service v. Garrison*, 28 Cal.2d 790, 802 [172 P.2d 4, 167 A.L.R. 306].)

■ Petitioner argues that the classification here involved discriminates against the investor of small means and in favor of wealthy investors in horse racing corporations. It is doubtful that it is in a position to raise that question, for it is not of the class claimed to have been discriminated against, but in any event we believe such distinction could be made a valid basis for the action of the Legislature in making such classification. It is quite possible that persons of small means may

be in need of special protection, for they have not the capital to make adequate preinvestment investigations, and in case of loss, the injury to them is of greater consequence. (See *Dillingham* v. *McLaughlin, supra.*) This is just one possible basis for the legislation and regulation here involved. *Gulf, Colorado & Santa Fe Railway Co.* v. *Ellis*, 165 U.S. 150 [17 S.Ct. 255, 41 L.Ed. 666], is not in point. There it was held that railroad companies alone could not be required constitutionally to pay attorneys' fees in certain cases, and the court said a classification could not be based on wealth, that is, ability to pay. Here we have no such distinction. It is a class with particular characteristics, which, because of such characteristics, may require special protection. Moreover, it has been recently stated that: "The fallacy of the argument that the law favored the rich over the poor 'lies in the failure to distinguish between equality of opportunity and ability to take advantage of the opportunity which is offered to all. The equality of the Constitution is the equality of right, and not of enjoyment.' (*Watson* v. *Division of Motor Vehicles* (1931), *supra,* p. 284 of 212 Cal. [212 Cal. 279 (298 P. 481].)" (*Escobedo* v. *State of California*, 35 Cal.2d 870 [222 P.2d 1].) Persons of small means today may be wealthy tomorrow and invest in the horse racing business.

It was held in *Krause* v. *Durbrow*, 127 Cal. 681 [60 P. 438], relied upon by petitioner, that a statute was invalid which established special regulations for the election of the directors of mining corporations. Plainly that case has none of the factors above discussed.

■ Section 25511 of the Corporations Code, *supra,* argues petitioner, does not authorize a restriction on the par value of shares issued as a stock dividend for it is not a sale "for the purpose of raising funds with which to finance" racing enterprises, and that the claimed wider scope given to it by the corporation commissioner's regulation, *supra,* which refers to the issuance of securities in "any other manner" exceeds the power of the commissioner. Considering the purposes of the legislation above discussed, we think it does cover the issuance of securities as a stock dividend. If the corporation does not pay a cash dividend, it may be retaining the funds available therefor, if there are any, and those funds might be used in financing additional racing enterprises. If there is no cash for dividends, the prognosis of the corporation's health may not be good and the investment would be all the more risky. The stock issued as a dividend to the stockholders may

well be offered for sale by the latter and thus create the conditions which are sought to be avoided by section 25511 and the above mentioned regulation.

Other points are raised by defendant but in view of the result reached herein they need not be considered.

The judgment is reversed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied December 14, 1950.