[Civ. No. 40554. Second Dist., Div. Three. May 9, 1973.]

CALIFORNIA STATE EMPLOYEES' ASSOCIATION et al.,
Plaintiffs and Appellants, v.
HOUSTON I. FLOURNOY, as State Controller, et al.,
Defendants and Respondents.

## COUNSEL

Mohi, Morales, Dumas & Glasman, Walter W. Taylor and Frank C. Morales for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Anthony S. Da Vigo, Deputy Attorney General, Thomas J. Cunningham and John E. Landon for Defendants and Respondents.

## OPINION

**SCHAUER (Richard), J.**[*]—Petitioners brought the subject class suit for a writ of mandate and declaratory relief on behalf of the faculties and academic employees of the University of California and California State Colleges. The basis of the suit alleged in petitioners' "First Amended Petition for Writ of Mandamus" is that the aforementioned academic personnel did not receive salary increases for the fiscal year, 1970-1971. General demurrers[1] of respondents Houston I. Flournoy in his capacity as Controller of the State of California, the Trustees of the California State Colleges and the Regents of the University of California were sustained without leave to amend as to each of the six causes of action contained in the first amended petition. Petitioners appeal from such order sustaining the demurrers and from the order of dismissal entered thereon under Code of Civil Procedure section 581, subdivision 3.

Although the instant order of dismissal is an appealable "judgment" pursuant to Code of Civil Procedure section 581d, the order sustaining the general demurrers is not appealable and the purported appeal therefrom must be dismissed. (Code Civ. Proc., § 904.1; *Beazell* v. *Schrader,* 205 Cal.App.2d 673, 674 [23 Cal.Rptr. 189].)

Petitioners contend that each of their six causes of action alleges facts sufficient to constitute a cause of action, and in support thereof propound basically a four-fold argument as follows: (1) the first two causes of action allege facts demonstrating that the legislative act in question which ex-

---

[*]Assigned by the Chairman of the Judicial Council.

[1]At the time of the hearing herein, Code of Civil Procedure section 430 (now Code Civ. Proc., §§ 430.10, subd. (f), 430.30, subd. (a), 430.40, subd. (a)) read in pertinent part: "The defendant may demur to the complaint within the time required in the summons to answer, when it appears upon the face thereof, or from any matter of which the court must or may take judicial notice, . . .: [¶] 6. [t]hat the complaint does not state facts sufficient to constitute a cause of action."

cluded the salary increases was an unconstitutional bill of attainder; (2) the third cause of action alleges facts establishing an implied contract imposing an obligation to pay salary increases on the Regents of the University of California; (3) the fourth and fifth causes of action state facts showing an unlawful failure by the California State Legislature to appropriate funds in view of the salary-establishing authority of the educational institutions concerned; and (4) the sixth cause of action alleges facts which point to an unequal application to the class of the subject legislative act in violation of the Fourteenth Amendment to the United States Constitution.

### The Allegations as to a Bill of Attainder

The first two causes of action involve, respectively, the faculty and faculty-related positions of the University of California, and the instructional and instructional-related employees of the California State Colleges. The first cause of action alleges that the Regents of the University of California, hereinafter referred to as "Regents," have "the salary-establishing jurisdiction" with regard to the university's academic employees; and the second cause of action alleges similar "salary-fixing jurisdiction" in the Trustees of the California State Colleges, hereinafter referred to as "Trustees," with regard to the academic employees of the state colleges. In both causes of action petitioners allege that after salary increases, of 7.2 percent and 7 percent respectively for the classes, were "established" in accordance with traditional practices by the respective salary-fixing authority involved, such authority ". . . made a request of the Governor and of the State Legislature for an appropriation of funds to meet the salary increases . . ." and "[t]he Governor's proposed budget for the 1970-71 fiscal year contained a provision to provide an increase of . . . 5% across-the-board, thereby agreeing to provide part of the funds requested . . . for salary increases." It is further alleged that committees of the state Legislature deleted the salary increases from the proposed budget and that "[t]he Budget Act of 1970, therefore, did not provide funds for salary increases of . . . [academic personnel] but instead expressly excluded them from the Salary-Increase Appropriations in Item 247 of the Budget Act of 1970. . . ." although such item 247 appropriated funds ". . . for a 5% across-the-board salary increase for [with insignificant exception] every person in the State's employ, that is, approximately 150,000 employees, or all of the state civil service employees, the exempt employees and the support or non-academic employees of the University and the State Colleges."

Petitioners then allege that "[t]he Legislature refused to appropriate said monies for increases in salaries of the academic employees . . . be-

cause of the existence of the political and social conditions in the . . . campuses and the disturbances and unrest engendered thereby, which resulted, at times, in force, violence, and unlawful practices by the students, and which the State Legislature arbitrarily and without any factual basis attributes to the action or inaction of the academic employees [and] [t]he sole reason for the Legislature's denial of the funds . . . was to punish the academic employees for the existence of the political and social conditions on state campuses which it wrongfully attributes to petitioners."

Other allegations in the first and second causes of action are to the effect that the legislative refusal to make appropriations for the salary increases "was not based upon any objective evidence"; that on June 30, 1970, the State of California had sufficient surplus funds to meet the salary increases; and had the appropriations been made, the salary-establishing authority ". . . would have adjusted the academic salaries in accordance with their establishment."

The sole issue presented by the first and second causes of action is one of first impression in California: Does the legislative failure to appropriate funds for salary increases of public employees constitute "punishment" within the meaning of the anti-attainder provisions of the federal and state Constitutions?

The United States Constitution provides that "No Bill of Attainder . . . shall be passed" (U.S. Const., art. I, § 9) and that "No State shall . . . pass any bill of attainder" (U.S. Const., art. I, § 10). The Constitution of the State of California likewise states that "No bill of attainder . . . shall ever be passed." (Cal. Const., art. I, § 16.)

Historically, a bill of attainder was a legislative act which, without a judicial trial, decreed punishment of death with consequences of forfeiture of property and "corruption" or "attaint" of the bloodline of the supposed wrongdoer; if the act imposed a lesser punishment than death, there was no "attaint" and the bill was one of "pains and penalties." (See *United States* v. *Lovett,* 328 U.S. 303, 317, fn. 6 [90 L.Ed. 1252, 1260, 60 S.Ct. 1073]; Coke, Commentary Upon Littleton (1st Am. ed. 1853), §§ 8.a, 134.b, note (1), 390.b, 391.a; 2 Blackstone, Commentaries (Cooley 4th ed. 1899) p. 1419.) It has been consistently held that "[w]ithin the meaning of the Constitution, bills of attainder include bills of pains and penalties." (*Cummings* v. *The State of Missouri,* 71 U.S. (4 Wall.) 277, 323 [18 L.Ed. 356, 363]; see also *United States* v. *Lovett, supra,* 328 U.S. 303, 315 [90 L.Ed. at p. 1258]; *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 377 [18 L.Ed. 366, 369-370].) ▪ In modern application the definition is that "[a] bill of attainder is ' "a legislative act which inflicts punishment without a judicial trial." ' [Citations.]" (*Department of Social Welfare* v. *Gardiner,*

94 Cal.App.2d 431, 433 [210 P.2d 855].) Such ". . . legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." (*United States* v. *Lovett, supra,* 328 U.S. at pp. 315-316 [90 L.Ed. at p. 1259].)

In asserting that chapter 303, item 247[2] of the California Budget Act of 1970 was an unconstitutional bill of attainder, petitioners exclusively rely on *United States* v. *Lovett, supra,* 328 U.S. 303, for the proposition that a legislative failure to appropriate funds for the salary or salaries of a named or identifiable public officer, employee or class of personnel constitutes punishment within the meaning of the constitutional anti-attainder provisions. But *Lovett* did not so hold. The congressional statute declared unconstitutional by the United States Supreme Court in *Lovett* contemplated the existence of salary appropriations and expressly forbade their use as compensation for the personal services of certain named government employees who were supposed "subversives." It purported permanently to bar such persons from any further federal employment, other than as jurors or military personnel, absent new presidential appointments of such persons confirmed by the United States Senate. This aspect of *Lovett,* which affirmed the Court of Claims, was expressly recognized in a concurring opinion of the trial court in *Lovett* v. *United States,* 66 F.Supp. 142 at page 149 [104 Ct.Cl. 557], as follows: "If Section 304 [of the Urgent Deficiency Appropriation Act of 1943] were a mere denial of appropriation, however unjust it might be, it could not be successfully ques-

---

[2]The text of item 247 was alleged in the first amended petition as follows:

"247—For Salary Increase Fund, to be allocated by the Department of Finance to the several state offices, departments, boards, bureaus, commissions, and other state agencies, in augmentation of their respective appropriations for support or for other purposes, in such amounts as will make sufficient money available to be paid each state officer or employee in the state service *other than personnel in faculty and faculty-related classifications in the University of California whose salary ranges are set by the regents and instructional and instructional-related positions in the California State Colleges whose compensation, or portion thereof, is chargeable to the General Fund,* the increase in compensation provided for in any increased salary range or rate including staff benefits established on or after July 1, 1970 by the State Personnel Board or other salary-fixing authority................. 40,700,110
 Schedule:
 "(a) For increases in compensation set by the State Personnel Board or other salary-fixing authority *exclusive of the Regents of the University of California and the Trustees of the California State Colleges*..................... 29,300,110
 "(b) For increases in compensation for *nonfaculty* positions established by the Regents of the University of California......................... 6,700,000
 "(c) For increases in compensation for *noninstructional* positions established by the Trustees of the California State Colleges...................... 4,700,000"
 (Italics supplied.)

tioned. But it does not stop with a mere denial of appropriation. It goes far beyond this. It forbids on a permanent basis employment in the future. It thus becomes a permanent legislative ban."

The United States Supreme Court emphasized this same feature: "Nor can we agree with counsel for Congress that the section did not provide for the dismissal of respondents but merely forbade governmental agencies to compensate respondents for their work or to incur obligations for such compensation at any and all times . . . [¶] We hold that the purpose of § 304 was not merely to cut off respondents' compensation through regular disbursing channels but permanently to bar them from government service, and that the issue of whether it is constitutional is justiciable. The section's language as well as the circumstances of its passage which we have just described show that no mere question of compensation procedure or of appropriations was involved, but that it was designed to force the employing agencies to discharge respondents and to bar their being hired by any other governmental agency." (*United States* v. *Lovett, supra,* 328 U.S. at pp. 313-314 [90 L.Ed. at p. 1258].)

■ In the instant case, the mere declination of the California State Legislature to appropriate funds for salary increases for academic personnel during the fiscal year 1970-1971 is not tantamount to a ban on continuing state employment of such personnel. In fact, the general support appropriation for the University of California for that year was in excess of the comparable support appropriation by the Legislature for the preceding 1969-1970 fiscal year.[3] Hence, the California State Legislature provided for the on-going payment for 1970-1971, without reduction, of then existing academic salaries. Manifestly, such legislative conduct cannot be equated with a bar to future employment of the academicians and is not punishment which is a necessary adjunct of a bill of attainder.[4]

Although the issue is novel in California, the Supreme Court of Minnesota in *Starkweather* v. *Blair,* 245 Minn. 371 [71 N.W.2d 869], has con-

---

[3]We take judicial notice of "public statutory law of this state." Evidence Code, section 451, subdivision (a). Cf. item 87, Statutes 1970, chapter 303, page 594 with items 110, 297, subdivision (b), 298 and 299, Statutes 1969, chapter 355, pages 750, 784, 786-787.

[4]In the case at bench there was no legislative interdiction of a benefit previously enjoyed or already conferred. No reduction in salary was decreed. ..

"It is now well established that a . . . teacher has no vested right to a particular salary and that such salary may be changed by the administrative authority. [Citations.]" (*Kacsur* v. *Board of Trustees,* 18 Cal.2d 586, 591-592 [116 P.2d 593]; see *Gilbaugh* v. *Bautzer,* 3 Cal.App.3d 793, 796-797 [83 Cal.Rptr. 806] [associate professor of a state college].)

sidered the consequences under the constitutional anti-attainder clauses, of a legislative refusal to appropriate monies for the support of a particular state office. In *Starkweather,* the plaintiff had been Assistant Director of the Minnesota Division of Game and Fish until the Minnesota Legislature appended to its budget act a rider providing that " 'Of the amounts appropriated for salaries [for the administrative personnel in the Division of Game and Fish] in Item 1a above, no part shall be used to pay the salary of an Assistant Director of the Division of Game and Fish.' " (71 N.W.2d at p. 872.) As a result of the denial of the full salary rather than, as here, just a salary increase, plaintiff was terminated in his position.

He thereafter sought and obtained another, but less well compensated, position in the division. Plaintiff then brought suit for declaratory relief as to his civil service status and right to compensation as assistant director. He prevailed in the trial court, but on appeal the Minnesota Supreme Court reversed, commenting on the attainder aspects of the matter as follows: "There are many distinguishing features between the Lovett case and the one now before us. In the first place, the act involved in the Lovett case goes much further than to prevent payment of the salary of named individuals in any particular job. It permanently barred them from any federal employment. . . ." (*Id.* at p. 875.)

"There is also another vital and probably insurmountable difference in the proof offered in the two cases. Apparently the Lovett case is the first in which the court has gone beyond the language of the act itself in seeking to determine the motive of congress in passing a bill. We have frequently held that the motives of the legislative body in enacting any particular legislation are not the proper subject of judicial inquiry. It must be kept in mind that there is an obvious difference between examining the journals of the legislature in seeking to determine legislative intent, *i.e.,* what the legislature intended by the language it used, and in seeking to determine the motives of the legislature in passing an act. As long as the legislature does not transcend the limitations placed upon it by the constitution, its motives in passing legislation are not the subject of proper judicial inquiry. . . ." (*Id.* at pp. 875-876.)

"It would seem clear that a legislative act may be a bill of attainder, even though the party or parties against whom it is aimed are not named, if it can be ascertained against whom it is aimed. It is also true that the legislature may not use a constitutional power to accomplish an unconstitutional result. But, no matter how liberally we apply these rules, the act here involved, on the state of the record before us, cannot be held to be a bill of attainder. *It is simply an act refusing to appropriate money for the salary of a named office, no matter who holds the office, and nothing more.*

*"Unlike the congressional act involved in the Lovett case, which effectively barred the individuals named from holding any position in the federal service, the act now before us does not prevent plaintiff from holding any position whatsoever."* (Fns. omitted and italics supplied.) (*Id.* at p. 879.)

The matter of judicial inquiry into legislative motivation has been the subject of the following observations by our California Supreme Court: "The authority and duty to ascertain the facts which ought to control legislative action are, from the necessity of the case, devolved by the constitution upon those to whom it has given the power to legislate, and their decision that the facts exist is conclusive upon the courts, in the absence of an explicit provision in the constitution giving the judiciary the right to review such action. We therefore hold, that in passing upon the constitutionality of a statute, *the court must confine itself to a consideration of those matters which appear upon the face of the law,* and those facts of which it can take judicial notice. If the law, when thus considered, does not appear to be unconstitutional, *the court will not go behind it,* and, by a resort to evidence, undertake to ascertain whether the legislature, in its enactment, observed the restrictions which the constitution imposed upon it as a duty to do, and to the performance of which its members were bound by their oaths of office.

". . . . . . . . . . . . . . . . . . .

"This view seems to be sustained by the decisions of the highest courts of other states, and is in harmony with the central idea of the constitution in prescribing the independence and equality of the three great departments of the state. . . .

". . . . . . . . . . . . . . . . . .

"If experience shall demonstrate that further restriction upon legislative power over the subject of appropriations of public money is necessary, it is within the power of the people to so amend the constitution as to provide that, notwithstanding an appropriation made by the legislature for its payment, the legality of every claim against the state shall or may be the subject of judicial investigation as to the facts upon which it rests. But in the absence of a plain direction to that effect, the courts are not authorized to institute such an inquiry." (Italics supplied.) (*Stevenson* v. *Colgan,* 91 Cal. 649, 652-653 [27 P. 1089]; see *Dittus* v. *Cranston,* 53 Cal.2d 284, 286 [1 Cal.Rptr. 327, 347 P.2d 671]; *Child* v. *Warne,* 194 Cal.App.2d 623, 639 [15 Cal.Rptr. 437].)

Even if we indulge in an inquiry as to the motivation for the instant

legislative refusal to appropriate monies and give full effect to petitioners' allegations concerning legislative response to supposed campus turmoil, we perceive no more than an employer's mild dissatisfaction with past services rendered by employees. It is apparent that even legislation which *entirely withholds* salaries for a public office or class of public employees does not approach, in penal character, the statute held by the United States Supreme Court in *Lovett* to be one which " 'operates as a legislative decree of perpetual exclusion' from a chosen vocation." (*United States* v. *Lovett, supra,* 328 U.S. at p. 316 [90 L.Ed. at p. 1260].) Thus, petitioners' reliance upon *United States* v. *Lovett,* *supra,* is misplaced. Inasmuch as the alleged legislative conduct in the case at bench did not operate to exclude the subject academic personnel from employment or even to reduce their compensation, we conclude that no punishment was imposed within the meaning of the constitutional anti-attainder provisions and hence the facts alleged do not infer passage by the California State Legislature of a bill of attainder. The general demurrers to the first and second causes of action were correctly sustained.

### The Allegations as to Implied Contract

The third cause of action in the first amended petition is directed at the Regents. It is alleged therein that the Regents' "uniform practice" for at least 20 years has been to review university academic personnel salaries in light of comparable salaries being paid by other institutions of higher learning and to thereby determine "the median average salary being paid by the institutions surveyed . . . and a percentage increase across-the-board established for payment to academic employees of the University." There are further allegations that such "uniform practice" was "generally known" by the university academic personnel who ". . . rendered services in reliance on said uniform practice for the establishment of the salaries due them"; that the Regents followed such practice in 1969 and early 1970 and as a result "established a 7.2% salary increases [*sic*] in their 1970-1971 Budget"; and "[t]he Regents thereafter made a request of the Governor and of the State Legislature for an appropriation of funds to meet the salary increases which The Regents established to be due." Other allegations are to the effect that although throughout the fiscal year in question the university had sufficient unrestricted funds to pay the salary increases, the Regents failed to do so and thus acted in a manner which was ". . . palpably unreasonable and arbitrary and an abuse of discretion reposed in said Regents as the salary-fixing authority for petitioners."

Petitioners urge that the third cause of action states facts giving rise to an implied contract and cite *Silva* v. *Providence Hospital of Oakland,* 14

Cal.2d 762, 773 [97 P.2d 798], wherein the Supreme Court stated that an implied in fact ". . . contract, as defined by the Civil Code 'is one, the existence and terms of which are manifested by conduct.' (Sec. 1621.) 'In general an implied contract, in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being in the mere mode of proof by which they are to be respectively established. The law will imply that a party did make such a stipulation as under the circumstances disclosed, he ought, upon the principles of honesty, justice and fairness to have made. Of course, all the circumstances actually surrounding the parties in the particular transactions are to be carefully considered before this implication of a promise is to be indulged.' [Citations.] The true implied contract, then, consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words. [Citations.]"

Thus, "[a]n implied contract is consensual in nature." (*City of Pasadena* v. *County of L. A.,* 118 Cal.App.2d 497, 499 [258 P.2d 28].) "[T]o authorize compensation in such cases the circumstances must be such as to warrant the inference that it was *the expectation of both parties* that compensation should be made." (*Mayborne* v. *Citizens T. & S. Bank,* 46 Cal.App. 178, 182 [188 P. 1034].) (Italics supplied.)

Such expectation and consent on the part of the Regents to pay salary increases, *absent legislative appropriation* therefor, cannot be inferred from the course of conduct alleged. The third cause of action expressly alleged that for the fiscal year 1970-1971 the Regents ". . . made a request of the Governor and of the State Legislature for an appropriation of funds *to meet the salary increases. . . .*" And we judicially notice statutes of prior years by which the Legislature provided appropriations specifically for salary increases of the university academic personnel.[5] Even petitioners' supplemental memorandum of points and authorities in opposition to demurrers, submitted to the court below, concedes that "the traditional practice of the university regents" has been to adjust—and therefore to obtain—funds appropriated by the Legislature for employee salary increases.[6]

---

[5]Item 277.2, 1965 Statutes, chapter 757, page 2250; item 314, 1966 Statutes, chapter 2, page 1057; items 253.1, 253.3, 253.6, 1967 Statutes, chapter 500, pages 1768, 1769, 1771-1772; items 258.5, 259, 1968 Statutes, chapter 430, pages 957-958; items 298, 299, 1969 Statutes, chapter 355, pages 786-787.

[6]Petitioners' trial court memoranda of points and authorities are before us upon request of petitioners as part of the clerk's transcript herein. A portion of petitioners' supplemental memorandum of points and authorities in opposition to demurrers reads as follows: "Item 247, however, was expressly enacted to provide salary

In view of the above, it is clear that regental practice with regard to personnel salary increases has been to apply for, and obtain, a legislative appropriation with which to pay the salary increases. The allegations of the third cause of action infer no more than that. Indeed, such allegations can be construed only to the effect that the Regents did exactly that which was expected and relied upon by the academic personnel, namely, the Regents carried out their usual practice to authorize salary increases and apply for a funding by legislative appropriation. There are no allegations, and none truthfully could be made, that the Regents' practice has been to pay salary increases without regard to legislative appropriation. The practice which has been alleged plainly is not the equivalent of consent to pay the increases even if the legislative appropriation is not made.

The case of *Youngman* v. *Nevada Irrigation Dist.*, 70 Cal.2d 240, 246-247 [74 Cal.Rptr. 398, 449 P.2d 462], is relied upon by petitioners for the proposition that the third cause of action herein is a sufficient pleading of facts to establish a cause of action for an implied contract. In *Youngman*, employees of the defendant water district brought suit for salary increases allegedly arising from an implied contract; the allegations were to the effect that ". . . the district had an 'announced practice' to grant annual wage increases, that this 'practice' was adopted 'after negotiation' with the [union], that the employees were aware of the 'practice,' and that the district had complied with its 'practice' in the prior year." (*Id.* at p. 247.) Although the judgment of the trial court, entered after orders sustaining general demurrers, was reversed in *Youngman*, it is not controlling here for two reasons. First, in *Youngman*, unlike the case at bench, there was no allegation nor practice regarding appropriation by the Legislature of funds to pay the salary increases. Second, an irrigation district has the power to levy taxes (Wat. Code, § 25500 et seq.; Cal. Const., former art. XI, § § 12 and 13, now art. XIII, § 37; cf. *Nevada Irr. Dist.* v *Keystone Copper Corp.*, 224 Cal.App.2d 523 [36 Cal.Rptr. 775]) and hence need

increases to the employees of the colleges and university. This appropriation for salary and wage increases fell short of requests made by the colleges and university as appropriations for salary increases have in recent years. But it has been the traditional practice of the university regents and the college trustees to spread any appropriated funds, pro-rata, among their respective employees. In other words, if the regents and trustees requested funds for salary and wage increases to provide a 7% increase pro-rata or across-the-board, but received an appropriation of funds that would allow only a 5% increase across-the-board the decreased funds would be pro-rated so that each employee received his share of the appropriated funds. The legislature merely appropriates funds and the administrators take care of the percentage increase."

not appeal to the Legislature for funds required for salaries, whereas the Regents' practice has been to make such appeal.[7]

Accordingly, in the instant case the course of conduct alleged does not imply a promise by the Regents to pay academic personnel salary increases, absent the usual legislative appropriation. The general demurrers to the third cause of action were properly sustained.

### The Allegations as to Unlawful Legislative Inaction

The fourth and fifth causes of action[8] are similar in alleging arbitrary and unjustified refusal by the Legislature to appropriate funds for the salary increases authorized by the salary-fixing authorities. But whereas the fourth cause of action is predicated upon the theory that the Regents have exclusive power, constitutionally protected against legislative conduct, to establish university employee salaries, the fifth cause of action is grounded upon statutory delegation by the Legislature to the Trustees of the power to establish salaries of state college personnel.

In the fourth cause of action it is alleged that "[t]he Legislature was without discretion to provide less than the Regents had established to be due under Article IX, section 9 of the California Constitution."[9] And it is well recognized that ". . . the University is a constitutional depart-

---

[7]The Regents are given no power to levy taxes but, as indicated above, the University of California partially relies upon legislative appropriations for its support.

"Aside from receiving part of its costs of operation from the federal government for the performance of special services and education of government personnel and veterans, [fn. omitted], the University of California is maintained by a combination of tuition and other fees and charges [fn. omitted], biennial *appropriations by the legislature* [fn. omitted], and endowments." (49 Cal.Jur.2d, Universities and Colleges, § 66, p. 515.) (Italics supplied.)

Indeed, the University of California, itself lacking the reservoir of tax revenues, has long been the subject of ". . . an appropriation of money to and for the uses of the university, and it goes from the state into the hands of the treasurer of the university . . ." (*Estate of Royer*, 123 Cal. 614, 623 [56 P. 461].) And support of the University of California, along with the rest of the state school system, is made a first charge on state revenues under article XIII, section 15, of the California Constitution.

[8]The fourth cause of action incorporates by reference most of the allegations of the first cause of action. The fifth cause of action similarly incorporates by reference most of the second cause of action.

[9]The pertinent portion of section 9(a) of article IX of the California Constitution reads as follows: "The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure compliance with the terms of the endowments of the university and the security of its funds."

ment or function of the state government [citations] . . . [and] [t]he Regents have the general rule-making or policy-making power in regard to the University [citations] and are . . . fully empowered with respect to the organization and government of the University [citations] . . . ."(*Goldberg* v. *Regents of the University of California,* 248 Cal.App.2d 867, 874 [57 Cal.Rptr. 463].)[10]

■ But as hereinabove noted, the University of California is dependent upon legislative appropriations of tax revenue.[11] "It is thus seen that while the Regents are vested with a large degree of independence and discretion in respect to the details of the internal government of the University, beyond legislative interference or control, the finances of the University are subject to legislative scrutiny . . ." (3 Ops.Cal.Atty.Gen. 108, 109.) "In our opinion, therefore, Article IX, section 9 of the Constitution, governing the University, provides for legislative control over its finances." (*Id.* at p. 110.) Hence, although, as petitioners allege, the Regents may be granted salary-fixing authority by the state Constitution, there is nothing to suggest that they additionally are granted authority to compel the California Legislature to appropriate money to pay any faculty salary increases which the Regents may have authorized or "fixed."

In the fifth cause of action, petitioners allege that "Section 22607 of the Education Code gives to the Trustees of the California State Colleges the power and duty of establishing the salaries and wages of the employees of the California State Colleges." And petitioners contend ". . . that the State Legislature by the enactment of Section 22607 of the Education

---

[10]In view of the character of the University of California as a "statewide administrative agency" (*Ishimatsu* v. *Regents of University of California,* 266 Cal.App.2d 854, 864 [72 Cal.Rptr. 756]), we are asked, as was the court below, to take judicial notice of certain of its regulations and official acts specified by respondent Regents. Petitioners raise no objection thereto and, pursuant to Evidence Code section 452, subdivisions (a), (b) and (c) and section 453, we thus note the following: Regents' Standing Orders 103.10, 103.5, 110.2(a), section 28 (Personnel Division Retirement Manual); University Administrative Manual, section 52-20, section 172-24; University Personnel Rules for Staff, rule 12; "Regents' Contributions Faculty Deferred Annuity" of University Budget Director; "UC Operating Expenditures, Supported by State General Funds," Table 6.1 of U. of Calif. Office of the Vice-President—Planning & Analysis; Legislative Analyst's Table 51, 1967-68 Retirement Programs.

We may take judicial notice of statistical records and other reports and records of a state agency. (E.g., see *Harris* v. *Alcoholic Bev. etc. Appeals Bd.,* 62 Cal.2d 589, 595-596 [43 Cal.Rptr. 633, 400 P.2d 745]; *Doyle* v. *Board of Barber Examiners,* 219 Cal.App.2d 504, 516 [33 Cal.Rptr. 349].)

Of course, we consider on the instant demurrers ". . . any matter of which the court is required to or may take judicial notice . . ." (Code Civ. Proc., § 430, now Code Civ. Proc., § 430.30, subd. (a).)

[11]See footnote 7, *supra,* and California Constitution, article XIII, section 20.

Code[12] effectively and completely delegated the power and the duty of establishing salaries and wages of State College employees to the State College Trustees."

With regard to irrevocable delegation of the fixing of salaries of public employees, ". . . the Legislature may not thus divest itself of its constitutionally granted powers." (*Slavich* v. *Walsh*, 82 Cal.App.2d 228, 235 [186 P.2d 35]; see *City Council* v. *Superior Court,* 179 Cal.App.2d 389, 393-394 [3 Cal.Rptr. 796]; Cal. Const., art. IV, § 1.) And in any event Education Code section 22607 expressly provides that the Trustees have no authority to adjust salaries ". . . which require expenditures in excess of existing appropriations available for the payment of salaries." Further, section 9610 of the Government Code provides "[t]he fixing or authorizing the fixing of the salary of a State officer or employee by statute is not intended to and does not constitute an appropriation of money for the payment of the salary. The salary shall be paid only in the event that moneys are made available therefor by another provision of law." ■ Thus, it is apparent that the Legislature could not, and did not, delegate to the Trustees any salary-fixing authority which could not be entirely frustrated by legislative failure to appropriate funds.

As disclosed above, the basic issue in both the fourth and fifth causes of action is whether the legislative failure to provide appropriations is unlawful. Restating the same issue, it becomes whether the California State Legislature is under legal compulsion to appropriate monies for salary increases of public employees after such increases were authorized by those administrators who have the authority to adjust such salaries.

■ Since appropriation of tax revenues is a legislative power (Cal. Const., art. IV, § 1) the authority to appropriate monies resides with the California State Legislature under the familiar doctrine of separation of governmental powers (Cal. Const., art. III). Thus, neither the salary-fixing

---

[12]Education Code section 22607 provides in pertinent part: ". . . The trustees shall establish and adjust the salaries and classifications of all academic, nonacademic, and administrative positions and neither Section 18004 of the Government Code nor any other provision of law requiring approval by a state officer or agency for such salaries or classifications shall be applicable thereto. In establishing and adjusting such salaries, consideration shall be given to the maintenance of the state colleges in a competitive position in the recruitment and retention of qualified personnel in relation to other educational institutions, private industry or public jurisdictions which are employing personnel with similar duties and responsibilities. The establishment and adjustment of salaries for nonacademic employees shall be in accordance with the standards prescribed in Section 18850 of the Government Code. The trustees, however, shall make no adjustments which require expenditures in excess of existing appropriations available for the payment of salaries."

administrative authority nor the judiciary has power to compel a legislative appropriation of money. Long ago our Supreme Court considered this same subject in *Myers* v. *English,* 9 Cal. 341 at page 349: "It is within the legitimate power of the judiciary, to declare the *action* of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the Courts have no means, and no power, to avoid the effects of *non-action.* The Legislature being the creative element in the system, its action cannot be quickened by the other departments. Therefore, when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confided by the Constitution to the body possessing the power of taxation. There may arise exigencies, in the progress of human affairs, when the first moneys in the treasury would be required for more pressing emergencies, and when it would be absolutely necessary to delay the ordinary appropriations for salaries. We must trust to the good faith and integrity of all the departments. Power must be placed somewhere, and confidence reposed in some one." (Italics is that of the court.)

Petitioners rely upon the case of *State Board of Education* v. *Levit,* 52 Cal.2d 441 [343 P.2d 8], wherein it was held that a legislative budget item proscribing use of appropriations for acquisition of two named school books was an unconstitutional interference with the power of textbook selection specifically granted to the State Board of Education by a provision of the California Constitution. In *Levit,* however, the California Supreme Court found that the Legislature had superimposed an invalid condition upon *an appropriation which had been made* whereas in the case at bench it is alleged by petitioners that no appropriation was made rather than that an unlawful condition was imposed on the use of appropriated funds.[13] Hence, in *Levit* the court noted that the budget item restriction ". . . was not a curtailment of curriculum but was a prohibition against the particular books named." (*Id.* at p. 466.) In the case before us item 247 of the 1970 California Budget Act merely has the effect of a curtailment of salary increases by omitting appropriations therefor and thus is not analogous to the conditioned appropriation usurping a specifically granted constitutional power which the court found in *Levit.* Although arguably our California Constitution mandates the operation of state institutions of higher learning, even under the broadest interpretation of that document the pertinent direction to the Legislature is confined to financial support of employee salaries as distinct from annual salary increases for them. The Constitution grants to salary-fixing administrators neither specific nor implied power to raise academic salaries without regard to legislative funding.

---

[13]As in *State Board of Education* v. *Levit, supra,* 52 Cal.2d 441, there also was conditioned use of appropriated monies in *United States* v. *Lovett, supra,* 328 U.S. 303.

■ From the foregoing, it may be seen that the instant legislative inaction was not unlawful but in fact entirely within the constitutional prerogatives of the legislative branch of our government. Indeed, the capacity to provide funds carries with it the power to deny them. Accordingly, the allegations of the fourth and fifth causes of action are insufficient to state a cause of action.[14]

## The Allegations as to Unequal Application of the Law

In the sixth cause of action, it is alleged that although salary increases were provided for practically all other classes of state employees, comparable increases were denied the subject academic personnel notwithstanding that such increases granted to other state employees were ". . . based upon evidence of upward movements in salaries . . . in private industry and other public employment comparable to state employees as well as evidence of an increase in the 'cost-of-living' . . ." and notwithstanding that ". . . there is no material or intrinsic distinction between petitioners and the remaining 150,000 state employees" since the upward movement of comparable salaries and cost-of-living increase are applicable ". . . the same to petitioners as to the remaining 150,000 state employees and . . . therefore, uniform."

Petitioners argue that the sixth cause of action is predicated upon a violation of the Fourteenth Amendment to the United States Constitution in that the subject academicians were denied equal protection of the law since, it is claimed, there is no rational justification for the legislation conferring salary increases on all state employees other than academic personnel.

"Directing our attention to the constitutional guaranty of equal protection of the laws, we observe that it has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty, and property and in their pursuit of happiness. [Citations.] As observed in *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645], 'The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of

---

[14]Insofar as the first amended petition seeks a legislative appropriation of monies for any fiscal year other than the ensuing one, it is moot. We note that the 1970 California State Legislature is no longer in session and a subsequent legislative session may not appropriate funds for the fiscal year 1970-1971. (See Cal. Const., art. IV, § § 3, 12; *French* v. *Senate,* 146 Cal. 604, 607 [80 P. 1031].)

the law receive like treatment.' This concept does not, however, require absolute equality (*Douglas* v. *California,* 372 U.S. 353, 357 [9 L.Ed.2d 811, 814, 83 S.Ct. 814]; *In re Antazo,* 3 Cal.3d 100, 110 [89 Cal.Rptr. 255, 473 P.2d 999]) or that a statute necessarily apply equally to all persons (*Rinaldi* v. *Yeager,* 384 U.S. 305, 309 [16 L.Ed.2d 577, 580, 86 S.Ct. 1497]; *In re Antazo, supra*); rather, it permits a state to provide for differences so long as the result does not amount to an invidious discrimination. (*Douglas* v. *California, supra,* at p. 356 [9 L.Ed.2d at p. 814]; *In re Antazo, supra.*) [¶] In *Antazo,* the California Supreme Court took cognizance of the two-level test employed by the United States Supreme Court in reviewing legislative classifications under the equal protection clause with the observation that a different standard is employed in cases involving 'suspect classifications' or touching 'fundamental interests' as distinguished from cases in the area of economic regulation. In the former it must be established that the state has a *compelling* interest which justifies the law *and* that the distinctions drawn by the law are *necessary* to further its purpose; in the latter there is a presumption of constitutionality and it is required merely to establish that the distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]" (*Gray* v. *Whitmore,* 17 Cal.App.3d 1, 21-22 [94 Cal.Rptr. 904].) (Italics that of the court.)

▆ Classifications involving salary *increases* for state personnel, as opposed to employment itself, do not appear "suspect" or touching upon "fundamental interests." Hence, we are not concerned here with a "strict scrutiny" standard of review of the subject legislation. Under these circumstances the legislative necessity of classifications which are not arbitrary is well recognized, and "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." (*McGowan* v. *Maryland,* 366 U.S. 420, 426 [6 L.Ed.2d 393, 399, 81 S.Ct. 1101]; see also *Lelande* v. *Lowery,* 26 Cal.2d 224, 232-233 [157 P.2d 639, 175 A.L.R. 1109] and cases collected therein.)

The constitutional validity of separate classification of academic public employees for employment purposes has been the subject of prior comment in *California Federation of Teachers* v. *Oxnard Elementary Sch.,* 272 Cal.App.2d 514 [77 Cal.Rptr. 497], as follows: "It is generally acknowledged that essential distinctions exist between educational public agencies and general, non-educational public agencies, and for this reason educational agencies have traditionally received separate legislative treatment. [Citation.] . . . This legislation, separate from statutes relating to state, county and other public agency employees, . . . consistently, differ-

entiates academic from non-academic employees in the state colleges. (Cal. Admin. Code, tit. 5, §§ 42700-43700.) [*Id.* at p. 529.] [¶] Moreover, the separate treatment of public school system employees and employers with respect to employment relations is consistent with the established legislative pattern which logically differentiates various categories of employees in the state educational institutions. State colleges and universities are controlled by the comprehensive master plan of the Donahoe Higher Education Act (Ed. Code, § 22500 et seq.) providing, among other things, for the formation of a state academic senate with representatives from each of the state college campuses vested with state-wide responsibility to review educational policies and make presentations to the board of trustees for the state colleges. Further sufficient distinctions justified the differentiation: the state colleges and universities already had rules regulating employment relations; the members of their governing boards were appointed to serve for periods of 10 or more years; the academic employees of these institutions were not required to have state credentials and their terms of employment customarily have been fixed by administrative regulation. (Ed. Code, §§ 13261-13340, 13401-13470, 13501-13520, and 24201.)" (*Id.* at p. 530.)

We too perceive no arbitrary classification in the instant statutory distinction between academic employees and other state employees. Matters which the California Legislature could consider and which we may judicially notice demonstrate that state faculties, rationally and for economic considerations, constitute a class, if not a favored class, within the state.[15]

---

[15]See footnote 10, *supra,* as to regulations and acts judicially noticed herein.

University of California faculty members enjoy continuous tenure during satisfactory behavior and efficient service or definite terms of employment of from one to two years. (Regents' Standing Order 103.10 re Tenure and University Administrative Manual, § 52-20 re terms of service in the professorial ranks.) In contrast, nonacademic personnel are employees at will. (*Ishimatsu* v. *Regents of University of California, supra,* 266 Cal.App.2d at p. 858.)

Also faculty members are eligible for sabbatical leave. (Regents' Standing Order 103.5.)

By virtue of funds appropriated by the Legislature since the fiscal year 1966-1967, the Regents have been enabled to make a special contribution to the University of California retirement system for the benefit of faculty members; this added contribution amounts to 3 percent of their respective salaries. (Regents' Standing Order relating to the University of California Retirement System, § 28; extract from Legislative Analysts' review of the Budget Bill for 1967-1968 relating to the tax sheltered faculty annuity program; and University Budget Director's Memorandum, dated July 31, 1967, pertaining to the same matter.)

University academic personnel may be eligible for sick leave from the very beginning of their employment; they may be granted up to 90 days sick leave by the chancellor of their respective campus and up to one year by the president of the University of California. (University Administrative Manual § 172-24.) On the other

Obvious facts which establish a reasonable legislative purpose in according academicians special classification and warrant denial of their 1970-1971 salary increase are that in recent past years they have received salary increases in excess of nonacademic state employees and faculty personnel enjoy tenure and special benefits which provide them with more secure employment than other state employees possess. (See fn. 15, *supra.*) Legislative distinctions based on differing economic positions of classes affected have been held to be violative of neither equal protection nor due process safeguards. (E.g., see *Allied Stores of Ohio* v. *Bowers,* 358 U.S. 522, 526-530 [3 L.Ed.2d 480, 484-487, 79 S.Ct. 437]; *Williamson* v. *Lee Optical Co.,* 348 U.S. 483, 487-489 [99 L.Ed. 563, 571-573, 75 S.Ct. 461]; *A. F. of L.* v. *American Sash Co.,* 335 U.S. 538, 540-542 [93 L.Ed. 222, 224-225, 69 S.Ct. 258, 6 A.L.R.2d 481]; *State of California* v. *Ind. Acc. Com.,* 48 Cal.2d 365, 371-372 [310 P.2d 7]; *Hollywood Turf Club* v. *Daugherty,* 36 Cal.2d 352, 359-360 [224 P.2d 359].)

■ Since, as indicated above, we reasonably conceive a state of facts which sustains the legislative refusal to appropriate salary increase monies

hand, nonacademic employees must "earn" sick leave at the rate of one working day per month of full time service; they cannot anticipate sick leave, i.e., they cannot take sick leave in advance of earning it. (University Personnel Rules for Staff (nonacademic) Employees, rule 12.)

The nonresident tuition fee is subject to waiver for the minor children and the spouse of a faculty member. (Extract from Respondent Regents' Standing Order 110.2(a).)

Finally, we note that on two occasions over the eight-year period, beginning with the fiscal year 1963-1964 and ending with the fiscal year 1970-1971, the California Legislature appropriated monies for proportionately larger university faculty salary increases than it did for university nonacademic employee salary adjustments. Thus, in the fiscal year 1965-1966, a 7 percent salary increase was provided for the faculty while only a 5 percent salary range adjustment was established for nonacademic employees. Again, in the fiscal year 1966-1967, the Legislature provided for a 5.5 percent increase in the academic salary ranges, whereas it made provision for only a 4 percent adjustment in the salary ranges of nonacademic personnel. (Table, dated May 5, 1970, prepared by the University Office of the Vice President—Planning and Analysis, and entitled "U.C. Operating Expenditures Supported by State General Funds.")

With regard to special provisions for academic employees of the California State Colleges, see Education Code section 22607 regarding salary adjustments and appeals from dismissal, demotion or suspension and Education Code section 24207 regarding employment after attaining age 70. See also 5 California Administrative Code section 43560 regarding tenure rights of academic employees. In connection with past salary increases for state college academic personnel, as distinguished from other state personnel, for example see statutory classifications as follows:

Item 277.3, Statutes 1965, chapter 757, pages 2250-2251; items 315, 315.5, Statutes 1966, chapter 2, pages 1057-1059; items 253.2, 253.4, 253.7, Statutes 1967, chapter 500, pages 1768-1769, 1769-1770, 1772; items 259.5, 260, Statutes 1968, chapter 430, pages 958-959; items 300, 301, Statutes 1969, chapter 355, pages 787-788.

for state academicians who, as a class, enjoy other substantial economic benefits, we conclude that the Fourteenth Amendment to the United States Constitution is no bar to the instant legislative conduct. Accordingly, the trial court properly sustained the general demurrers to the sixth cause of action of the first amended petition.

## Conclusion

Relief prayed for under the first, second, fourth, fifth and sixth causes of action in the "First Amended Petition for Writ of Mandamus" is ". . . that respondent HOUSTON I. FLOURNOY, Controller of the State of California, be required to make payment to petitioners, academic employees . . . , of salary increases . . ." The California Constitution, article XIII, section 21, provides in pertinent part: "No money shall be drawn from the Treasury but in consequence of appropriation made by law, and upon warrants duly drawn thereon by the Controller." Inasmuch as the gravamen of the aforementioned five causes of action in the first amended petition is that no appropriation was made and we hold that the California Legislature was under no legal compulsion to make such appropriation for the subject salary increases, it follows that such relief prayed for cannot be granted. No cause of action is stated to compel the state Controller to draw a warrant in the absence of an appropriation. Indeed, ". . . pleading . . . of an available fund from which such salaries could be paid . . . is a condition precedent to the issuance of a writ compelling payment by a public official. (*Tevis* v. *City & County of San Francisco*, 43 Cal.2d 190, 200 [272 P.2d 757]). . . ." (*San Bernardino Fire & Police Protective League* v. *City of San Bernardino*, 199 Cal.App.2d 401, 417 [18 Cal.Rptr. 757]), and there is no possibility of such an available fund in the face of allegations, as here, that there was no appropriation of the fund. Similarly, and for reasons heretofore advanced, neither the Trustees nor the Regents (even under the implied contract theory of the third cause of action) can be the subject of either a direction by writ to pay salary increases in the absence of an existing appropriation or a declaration that they are obligated to make such payment.

Only the prayers for relief rather than the substantive allegations of the first amended petition suggest that the case at bench is one for declaratory relief and petitioners have not asserted any impropriety in sustaining general demurrers to causes of action seeking declaratory relief. But had they done so, the analysis above demonstrates that the issues presented by the first amended petition are legal, not factual, and are subject to adequate disposition on the demurrers here considered. "A trial court may properly sustain a general demurrer to a declaratory relief action without

leave to amend when the controversy presented can be determined as a matter of law." (*Silver* v. *City of Los Angeles,* 217 Cal.App.2d 134, 138 [31 Cal.Rptr. 545]; see *Emmons, Williams, Mires & Leech* v. *State Bar,* 6 Cal.App.3d 565, 575 [86 Cal.Rptr. 367]; *Stribling* v. *Mailliard,* 6 Cal. App.3d 470, 475 [85 Cal.Rptr. 924]; *Hagan* v. *Fairfield,* 238 Cal.App.2d 197, 201-202 [47 Cal.Rptr. 600].)

Although the demurrers to the first amended petition were sustained without leave to amend, petitioners do not contend that the trial court abused its discretion in denying them leave to further amend. Moreover, petitioners fail to indicate the nature of any amendment which could truthfully state additional facts that might aid their pleading, and from the nature of the defects hereinabove described it is, at the very least, improbable that any cause of action could be stated. Hence, though petitioners do not raise the issue, we conclude that there was no error in the trial court's denial of leave to amend. (See *La Vista Cemetery Assn.* v. *American Sav. & Loan Assn.,* 12 Cal.App.3d 365, 369 [90 Cal.Rptr. 722]; *Chacksfield* v. *L. A. County Flood etc. Dist.,* 245 Cal.App.2d 193, 195 [53 Cal.Rptr. 774]; *Diablo Beacon Printing & Pub. Co.* v. *City of Concord,* 229 Cal. App.2d 505, 509 [40 Cal.Rptr. 443].)

The purported appeal from the order sustaining general demurrers without leave to amend is dismissed. The judgment (order of dismissal pursuant to Code Civ. Proc., § 581, subd. 3) is affirmed.

Cobey, Acting P. J., and Allport, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 5, 1973.